**UNION REALTY COMPANY, LTD.,
et al., Plaintiffs–Appellants,**

v.

**Stephen D. MOSES and Arnold L.
Porath, Defendants–Appellees.**

Nos. 91–6202, 91–6203.

United States Court of Appeals,
Sixth Circuit.

Argued May 12, 1992.

Decided Jan. 22, 1993.

Rehearing Denied Feb. 19, 1993.

---

Henry L. Klein (argued and briefed), Apperson, Crump, Duzane & Maxwell, Memphis, TN, for plaintiffs-appellants in No. 91–6202.

---

Richard M. Carter (argued and briefed), Ronald W. McAfee, Martin, Tate, Morrow & Marston, Memphis, TN, for defendants-appellees in Nos. 91–6202 and 91–6203.

Henry L. Klein (argued and briefed), Patricia B. Stegemann, Apperson, Crump, Duzane & Maxwell, Memphis, TN, for plaintiffs-appellants in No. 91–6203.

Before: NELSON and SILER, Circuit Judges, and KRUPANSKY, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This lawsuit arises out of a purported contract for the sale of real estate. A written "purchase/sale agreement" that bore the signatures of both seller and buyers called for an earnest money deposit of $165,000, to which sum the agreement said the seller would be entitled if the buyers failed or refused to close the transaction. Although the buyers ultimately failed to close, they maintained they were not liable for the $165,000 because there was no "meeting of minds" on the handling of the earnest money.

On cross-motions for summary judgment, the district court concluded that the buyers were correct; the contract never came into existence, the court held, because a last-minute attempt by the seller to add a new condition regarding the earnest money meant that the seller never gave its unconditional assent to the contract. From a judgment dismissing its action, the seller has appealed.

Upon review we conclude that although the contract may not have become effective as early as the seller claims it did, the contract (or a slightly modified version of it) did become effective. The parties' conduct, in our view, manifests a mutual understanding that the earnest money would be handled in a manner proposed by the buyers themselves. We shall therefore reverse the judgment of the district court and remand the case for entry of summary judgment in favor of the seller.

I

Plaintiff Union Realty Company, Ltd., a Tennessee partnership, owned several apartment projects in the city of Memphis. The defendants, Stephen D. Moses and Arnold L. Porath—both of whom live in Los Angeles—entered into negotiations with Union Realty for the purchase of the properties.

Proposed contracts [1] were drafted by the defendants in California and were sent to Memphis for review. Union Realty made certain changes and asked its real estate broker to transmit the revisions to the prospective buyers. The broker did so on January 30, 1987, noting in his transmittal letter that "[t]he most important item that they changed was the location of the earnest money."

The buyers had apparently proposed that the earnest money be held in a Los Angeles financial institution called Brentwood Bank. (One of the buyers, Stephen D. Moses, was chairman of the board of directors of Brentwood Bank.) The seller wanted the earnest money to be deposited instead with Mid–South Title Insurance Company.

In transmitting the seller's proposed changes to the buyers, the broker noted that he might not have "explain[ed] to [the seller] adequately enough the reason for the earnest money being held in the bank you indicated." The broker went on to say that "I am certain that a letter from your bank affirming that the money will be dispersed [sic] in accordance with the contract conditions will assure them that this will really happen."

The contract was revised in California to provide, in ¶ 2(b)(i), that $165,000 would be deposited as earnest money with Brentwood Bank in Los Angeles. (According to the seller's general counsel—whose affidavit stands uncontradicted on this point—Mr. Moses requested that the earnest money be held by the bank of which he was chairman because a sale of the bank was

1. There were two separate transactions, one of which—a deal concerning Baron Hirsch Congre-

gation property—is not involved in this appeal.

impending and a withdrawal of funds by him might have an adverse affect on the sale.) As revised, ¶ 2(b)(i) of the contract went on to provide that "Brentwood Bank shall certify to Seller in writing that it has received the Earnest Money deposit."

The contract—which specified a $16,450,000 purchase price, against which the earnest money would be applied at closing— further provided, in ¶ 2(b)(ii), that the buyers would have 45 days from the date of execution in which to use their best efforts to obtain financing; that the earnest money would be refunded to the buyers if they gave written notice within the 45 days that they were unable to obtain financing; that if the seller had not received such notice at the end of the 45-day period, it would so notify Brentwood Bank in writing; and that "Brentwood Bank shall [thereupon] transfer the Earnest Money previously deposited with it to Mid-South Title Insurance Corporation in Memphis, Tennessee, to be held in escrow until closing." Other paragraphs provided that the closing would be held on or before the 90th day after execution of the contract, and that the seller would be entitled to retain the earnest money if the buyers failed or refused to close.

A form of contract containing these provisions and signed by the buyers in California was forwarded to Union Realty in Memphis for signature. An authorized official executed the contract for Union Realty on February 11, 1987, and February 11 was specified in the body of the document as the effective date.

Two days later, according to a letter that Stephen Moses sent Union Realty under date of February 13, Mr. Moses made a deposit of $165,000 in his bank pursuant to the contract. The text of Mr. Moses' letter read as follows:

"Pursuant to Paragraph 2(b)(i) of the Purchase and Sale Agreement made by and between the Union Realty Company, Ltd. and Stephen D. Moses and Arnold L. Porath, I have this day deposited in Brentwood Bank in Los Angeles, California, the sum of $165,000 as earnest money to be applied to the purchase price at closing.

I enclose herewith the evidence of that deposit."

The letter was accompanied by a photocopy of a Brentwood Bank certificate of deposit dated February 13, 1987, evidencing the deposit of $165,000 by Stephen Moses.

Given the facts related so far, one might think that there could be no question as to who should get the $165,000 if the buyers failed to give a 45-day notice of inability to obtain financing. The buyers gave no such notice, as we shall see, but because of what happened after the contract was executed, there is a serious question as to the proper disposition of the earnest money.

What happened was this. On February 16, 1987—three days after the earnest money was deposited in Brentwood Bank by Mr. Moses pursuant to the signed contract—Union Realty's general counsel, Keith Novick, sent Mr. Moses a letter enclosing two executed copies of the contract. The letter stated the seller was in the process of obtaining the title commitments and documentation required for the buyers' review, and it referred to the required statement from Brentwood Bank. In the latter connection, Mr. Novick made the following "request:"

"I would request that you provide an affirmative statement from Brentwood Bank that the deposits for both contracts are held in escrow, subject to the terms of the Contracts and an acknowledgment that these sums shall be delivered to the Sellers, respectively, in the event that Sellers advise the bank that the notice[s] pursuant to Sections 2(b)(i) and (ii) are not received. *Execution and delivery of the Contracts are conditioned upn* [sic] *receipt of this statement from Brentwood Bank within five days of this date.*" (Emphasis supplied.)

A carbon copy of Keith Novick's February 16 letter went to Jack Belz, a general partner of the seller. On March 8, 1987, Mr. Belz flagged the letter's reference to the "affirmative statement from Brentwood Bank" and wrote the following note

above it: "Keith—I *assume* you received this—did you?"

In point of fact, no affirmative statement had been received from Brentwood Bank. It appears that although Mr. Moses asked the bank to write Union Realty a letter confirming that Moses had established a $165,000 certificate of deposit relating to the purchase and sale agreement, the bank's president sent Mr. Moses a letter declining to do so. The letter, which was dated March 23, 1987, cited "ever-increasing problems with lender's liability" and an unwillingness to "do anything that might cause the bank to become involved in litigation or that might interfere with the pending sale of the bank to Westlake Thrift & Loan Association."

On April 6, 1987, Keith Novick sent defendant Moses a letter reading as follows:

"I have yet to receive the affirmative statement from Brentwood Bank that the deposits for both contracts are held in escrow subject to the terms of the contracts and acknowledgment that these sums would be delivered to the sellers in the event the bank is advised that the notice [sic] pursuant to Section 2(b)(i) and (ii) were not received.

This is probably an oversight and I would request that you provide me with this letter as soon as possible."

Under date of April 10, 1987, Mr. Moses replied as follows:

"In response to your letter of April 6, 1987, I enclose herewith a letter that Brentwood Bank wrote me some time ago and which I thought I had forwarded to you.

While it is not what you wanted, I hope that by implication, it accomplishes what you want." [2]

In the meantime, both sides appeared to be moving expeditiously toward a consummation of the sale in accordance with the contract. Under cover of a letter dated February 23, 1987—a letter beginning "[p]ursuant to the requirements of the contracts relative to the Union Realty Co., Ltd.

apartments"—Keith Novick sent Stephen Moses certain operating statements, tenant lists, title insurance commitments, property reports, warranties, tax receipts, inventory lists, surveys, and other documents. This material was supplemented in a similar letter—also sent "[p]ursuant to the requirements of the contracts"—dated February 27, 1987. It is undisputed that Keith Novick and others spent substantial time and effort compiling the data in question, and that the seller incurred obligations to an engineering firm and a title insurance company in this connection.

The buyers, for their part, submitted separate applications to the Health, Educational and Housing Facility Board of the City of Memphis for the issuance of industrial revenue bonds to finance five of the seven apartment projects identified in the February 11 contract. The applications, each of which was signed by Mr. Porath, were prepared on Facility Board forms. Item 2(d)(ix) of the form asked about "[o]ptions, contracts or other indicia of Applicants [sic] ownership of property." Each of the forms signed by Mr. Porath contained this sentence in response to item 2(d)(ix): "the property is under contract." A copy of the February 11 contract was attached.

Moses and Porath filed their applications with the Facility Board on or about March 3, 1987. The applications were accompanied by a $10,000 application fee in the form of a check, payable to the Board, drawn on Brentwood Bank.

The Facility Board considered the applications at a hearing held on March 9, 1987, at which time the Board adopted an "Inducement Resolution" with respect to each of the five projects. On April 13, 1987, the Board held a statutorily required public hearing on the issuance and sale of bonds for the purpose of financing the acquisition and renovation of the five projects, offering members of the public an opportunity to comment. The minutes of the meeting record that "[t]here were no questions or comments from the public." Nothing in

---

**2.** The version of this letter included in the record is marked "PROPOSED DRAFT." The parties stipulated, however, that this is a true and correct copy of Mr. Moses' April 10 letter, and that Moses provided Union Realty a copy of the letter from Brentwood Bank.

the minutes of either meeting reflects any question about the binding nature of the February 11 contract that Moses and Porath had filed with the Board.

Shortly before March 28, 1987, which was the scheduled expiration date for the 45–day period prescribed in ¶ 2(b)(ii) for the giving of notice of inability to obtain financing, the seller received word from the broker that the buyers were requesting an extension. The seller agreed to extend the time period to April 10.

Under date of March 30, 1987, an investment banking firm in Knoxville sent Mr. Moses a letter confirming an offer to purchase the bonds that the Facility Board was to issue. On April 3, 1987, a different investment banking firm gave Mr. Moses a "firm commitment" to purchase up to $21 million of such bonds.

Not surprisingly, April 10 came and went without Messrs. Moses and Porath having given Union Realty notice that they were unable to obtain financing. As far as the certification or "affirmative statement" from Brentwood Bank was concerned, the seller received nothing more than the March 23 letter forwarded by Mr. Moses with the expression of "hope that by implication, it accomplishes what you want."

The record does not indicate that the seller challenged the sufficiency of the letter from the bank. Proceeding as if the contract signed on February 11 were in full force and effect, the seller's general counsel, Mr. Novick, sent Brentwood Bank the following letter on April 15, 1987:

"According to the contracts dated February 11, 1987 between Moses and Porath as Buyers and Baron Hirsch Congregation and Union Realty Co., Ltd, as Sellers, you are holding a deposit [sic] in the amount of $10,000.00 and $165,000.00, respectively, as earnest money under the contracts. As counsel to the Sellers, I hereby certify that the Buyers have not received the notification required pursuant to Section 2(b)(ii).

Kindly forward the earnest money deposits to Charles Meyer, Mid South Title Insurance Corporation, One Commerce Square, Suite 1200, Memphis, TN 38103."

In a follow-up letter to Brentwood Bank dated April 24, 1987, Mr. Novick said this:

"I have yet to receive confirmation from Mid South Title that the earnest money deposit has been forwarded to the title company pursuant to the requirements of our contract.

Please contact me immediately in order to advise as to when you anticipate that this requirement of the contract will be satisfied."

This "requirement of the contract," if there was a contract, was never satisfied. By letter dated April 23, 1987, a lawyer with the firm of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, acting as outside counsel to Brentwood Bank and at the "specific request and instruction" of the bank, advised Mr. Novick "that the Bank held no deposits that were identified to it as earnest money under any contracts of any kind ... [3] [and] that the Bank will forward no money of any kind to or for the benefit of your clients."

Brentwood Bank advised Mr. Moses of Mr. Novick's letter concerning the earnest money deposit, and under date of April 24, 1987, Mr. Moses wrote Union Realty as follows:

"We understand that the agreement [of February 11, 1987] was never actually effective since we declined to make a deposit in form acceptable to you. We had several such conversations with Mr. Keith Novik [sic]."

Mr. Moses professed to be "surprised" at learning from Brentwood Bank of Mr. Novick's attempt to obtain the earnest money, and he said "I ... reject and deny such a claim."

Mr. Novick then sent Mr. Moses a letter insisting that the contract was indeed effective and demanding payment of the $165,000. Novick's letter denied that he

---

**3.** The Finley, Kumble letter made no reference to Brentwood Bank's letter of March 23, 1987, in which its president expressly acknowledged that Mr. Moses had asked that the bank "write a letter to Union Realty confirming that on February 13, [Moses] established in this bank a $165,000 certificate of deposit that related to a purchase and sale agreement with Union Realty."

had ever had any "conversations" of the sort claimed by Moses; stated that the use of Brentwood Bank as a depository during the 45–day review period had been agreeable to Union Realty "in view of the fact that you [Moses] represented yourself to be President [sic], a major shareholder of this Bank and were acting as agent for the Bank in agreeing that it would act as escrow agent;" and noted that Moses and Porath had specifically requested and received an extension of the 45–day review period prescribed by the contract.

A few weeks later Union Realty brought suit against Moses and Porath in the Chancery Court of Shelby County, Tennessee. The defendants removed the action to federal court on diversity grounds, and the defendants' motion for summary judgment was granted in September of 1991. This appeal followed.

## II

■ Citing Tennessee's "mirror image rule," under which "[a]n acceptance, to be effectual, must be identical with the offer and unconditional," *Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 31,

257 S.W. 398 (1924), the district court reasoned that because Mr. Novick's letter of February 16 purported to condition the execution and delivery of the contract upon receipt within five days of a statement from Brentwood Bank differing somewhat from the requirements of the contract, the letter represented a counter-offer that prevented the contract from going into effect;[4] that a counter-offer has the effect of a rejection and terminates the offeree's power to accept the original offer; and that because the buyers never accepted the counter-offer, the contract never came into existence.

This reasoning may be correct as far as it goes, but it does not go far enough. If Mr. Novick's letter of February 16 was a counter-offer (*i.e.*, if the contract had not already become effective by February 16), it is clear that the counter-offer was renewed—without any five-day limitation—on April 6, 1987, when Novick again requested Moses to provide the "affirmative statement" from Brentwood Bank. And if the April 6 letter represented a renewed counter-offer, it is equally clear that it evoked a counter-counter-offer from Mr. Moses on April 10.[5] The letter that Moses

4. Although Union Realty may have communicated its acceptance of the contract to Mr. Moses prior to Novick's letter, as is suggested by the fact that on February 13, 1987, two days after the contract was fully executed, Moses wrote Union Realty a letter stating that he had deposited $165,000 in Brentwood Bank "[p]ursuant to Paragraph 2(b)(i) of the Purchase and Sale Agreement," Union Realty does not press the argument that it was too late for Mr. Novick to make a "counter-offer," the contract already having gone into effect. We intimate no opinion as to the merits of such an argument.

5. Possibly because of our use of the word "if" here, the dissent asserts that the conclusion that Mr. Moses made a counter-counter-offer on April 10 rests on "creative conjectures" and "sheer speculation." In the context of the dealings between the parties, however, and accepting the dissent's assumption that no contract had come into being by February 16, we see nothing conjectural or speculative about the April 10 letter. Assuming *arguendo* (as we do for the reason explained in footnote 4) that there had not already been a complete meeting of minds, there is only one logical interpretation of what Mr. Moses meant when he expressed the hope that Mr. Novick would find Brentwood Bank's letter acceptable: Moses was saying that

the bank's letter was the best he could do, and he hoped that it would accomplish by implication what Novick wanted even though it was not what Novick had asked for. It goes without saying, we should have thought, that the remaining terms of the contract would stand as written if Novick yielded on the point under discussion.

In construing the Moses letter of April 10 as a counter-counter-offer, it does not seem to us that we are making a credibility determination, or weighing the evidence, or otherwise invading the province of the jury. Citing the Supreme Court's *Anderson, Celotex, Matsushita* trilogy, the dissent suggests that our interpretation of the Moses letter "reflects an overreaching of Supreme Court direction limiting lower court evidentiary considerations in summary judgment dispositions...." But determining the legal effect of documents such as the Moses letter has always been a matter for the court. See *Industrial Equipment Co. v. Emerson Electric Co.*, 554 F.2d 276, 284 (6th Cir.1977) ("The decision on the existence of a contract and the decision on the construction of a contract are both ultimate questions of law"). And far from diminishing the role of the lower courts in summary judgment dispositions, the *Celotex* trilogy expanded it. See *Street v. J.C. Bradford & Co.*,

sent Novick on that date invited Novick to accept Brentwood Bank's March 23 letter as *"accomplish[ing by implication] what you want."* (Emphasis supplied.) Mr. Moses was proposing, in other words, that the parties stick to the February 11 contract as signed, with Union Realty either waiving the bank certification requirement or accepting the bank's March 23 letter as complying with it "by implication."

886 F.2d 1472, 1476 (6th Cir.1989) ("Scholars and courts are in agreement that a 'new era' in summary judgments dawned by virtue of the Court's opinions in these cases").

**6.** It is well established that a counter-offer (or counter-counter-offer) may be accepted by conduct: see *Ismert and Assoc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 541 (1st Cir. 1986); *Kurio v. United States,* 429 F.Supp. 42, 64 (S.D.Tex.1970); *Hoffman v. Ralston Purina Co.,* 86 Wis.2d 445, 273 N.W.2d 214, 217 (1979); *Selig v. Philadelphia Title Ins. Co.,* 380 Pa. 264, 111 A.2d 147 (1955); *Wilkinson v. Lanterman,* 314 Mich. 568, 22 N.W.2d 827 (1946). Such acceptance does no violence to the "mirror image" rule of *Canton Cotton Mills v. Bowman Overall Co.,* 149 Tenn. 18, 257 S.W. 398 (1924).

The form of contract drafted and signed by the defendants contained provisions with which the defendants failed to comply, of course, and the dissent argues that the defendants' tender of alternate performance could not be accepted because of ¶ 18, which purports to bar any amendment not in writing and signed by the party to be bound thereby. This argument presupposes that the contract had already become effective by February 16—see n. 4, *supra,*—because ¶ 18 could hardly prevent the amendment of an agreement that had not yet become effective. And if the agreement had become effective by February 16, the defendants unquestionably violated it whether or not it was subsequently amended.

The dissent goes on to argue that ¶ (2)(b)(i), which provided for the $165,000 earnest money deposit and the certification by Brentwood Bank, was a "condition precedent which was of the essence of consummating any formal agreement between the parties." But ¶ (2)(b)(i) did not purport to be a condition precedent to the formation of a contract. Unless this paragraph was modified before the contract came into existence, in which event the modified version defined the defendants' obligation, ¶ (2)(b)(i) was nothing more or less than a contractual undertaking which the defendants had committed themselves to perform.

The dissent maintains that because (1) the defendants never honored their contractual undertaking to deposit $165,000 in earnest money with Brentwood Bank, and (2) the bank never certified that it had received the earnest money deposit, there was "a total failure of consider-

Mr. Novick responded affirmatively: he gave Brentwood Bank the written notification called for by ¶ 2(b)(i) of the contract, and he asked the bank to forward the earnest money not to the *seller,* as proposed in the "counter-offer," but to the *escrow agent* (Mid–South), as required under ¶ 2(b)(ii) of the contract.[6] The bank promptly advised Mr. Moses of this development, and it was only after Moses had

ation to consummate the agreement." With respect, we do not find this analysis persuasive.

In the first place, Mr. Moses would be hard pressed to deny that he deposited $165,000 as earnest money pursuant to the agreement, given the February 13 letter in which he explicitly told the seller that "[p]ursuant to [the agreement] I have this day deposited in Brentwood Bank ... the sum of $165,000 as earnest money...." We are not prepared to say that Mr. Moses was practicing sleight of hand here, trying to trick the seller into thinking it was bound to convey the property but secretly planning to take the earnest money back if he ultimately decided, notwithstanding the availability of financing, that he preferred not to honor his commitment to purchase the property or let the seller have the earnest money. It is true that Mr. Moses failed to get his bank to provide the agreed certificate, but it is also true that he tendered an explanatory letter from the bank and that he expressed the hope that the seller would accept the letter in lieu of a proper certificate. The seller, as we have seen, did so.

In the second place, the notion that there could be no consideration for the purchase/sale agreement if the seller accepted Moses' proposal is difficult to reconcile with universally accepted principles of contract law. The seller's waiver of any earnest money certification requirement could not have resulted in a failure of consideration, because Moses and Porath were promising to pay an agreed purchase price of $16,450,000 (of which $165,000 would be earnest money on deposit with Moses' bank), and the seller was promising to convey the real estate. In Tennessee, as elsewhere, mutual promises in an executory contract constitute sufficient consideration to make the contract enforceable. *Rodgers v. Southern Newspapers, Inc.,* 214 Tenn. 335, 379 S.W.2d 797 (1964).

In a final revision of the dissent, questions have been raised as to the manner and date of the seller's acceptance of the April 10 counter-counter-offer. The manner was acceptance by conduct; the date was April 15, 1987. It is true that the letter Keith Novick sent Brentwood Bank on that day did not reflect the mailing of a separate copy to the bank's chairman, Mr. Moses, but it is undisputed that the contents of the letter were communicated to Mr. Moses by the bank, as Mr. Novick was surely entitled to expect that they would be.

learned that Union Realty was adhering to the contract that he told Union Realty of his "understanding" that the contract was never actually effective. This "understanding" came too late; we think that Moses and Porath were clearly bound, just as Union Realty was.

Our disposition of the appeal on this ground makes it unnecessary for us to decide the numerous other issues raised by the parties. The judgment of the district court is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of Union Realty in the amount of $165,000 plus interest and costs.

KRUPANSKY, Senior Circuit Judge, dissenting.

In disposing of this controversy joined by cross-motions for summary judgment, the panel majority has relied upon legal and factual conclusions that are facially in conflict with the record before the court, Tennessee's "mirror image" rule, and the direct language of the executory agreement which had an effective date of February 11, 1987.

There is no ambiguity in the documented material necessary to resolve this dispute. None is charged.

Initially, it should be noted that the majority's reasoning is anchored in an erroneous observation that "[t]he parties' *conduct*, in our view, manifests a mutual understanding that the earnest money would be handled in a manner proposed by the buyers themselves." Maj.Op. at 716 (emphasis added).

The majority's reliance upon the "conduct of the parties" as integral to its rever-

sal of the trial court's decision is reasserted in its legal citations:

It is well established that a counter-offer (or counter-counter-offer) may be accepted by conduct: see *Ismert and Assoc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 541 (1st Cir.1986); *Kurio v. United States*, 429 F.Supp. 42, 64 (S.D.Tex.1970); *Hoffman v. Ralston Purina Co.*, 86 Wis.2d 445, 273 N.W.2d 214, 217 (1979); *Selig v. Philadelphia Title Ins. Co.*, 380 Pa. 264, 111 A.2d 147 (1955); *Wilkinson v. Lanterman*, 314 Mich. 568, 22 N.W.2d 827 (1946).

Maj.Op. at 721 n. 6.

This significant conclusion, which is the genesis of the majority's disposition, is in direct conflict with paragraph 18 of the executory agreement of February 11, 1987:[1]

**18.** *Entire Agreement, Amendments and Waivers*

This Agreement, including the exhibits hereto, contains the entire agreement and understanding of the parties in respect to the subject matter hereof and the same may not be amended, modified or discharged nor may any of its terms be waived except by an instrument in writing signed by the party to be bound thereby.

Obvious from the concise language of paragraph 18, the executory agreement could not have been *amended, modified* or *discharged* or *any of its terms waived except by an instrument in writing,* signed by the parties to be bound thereby.

It is equally apparent that in judging the conflict between the parties that if paragraph 18 is invoked by assigning credibility to the majority's creative counter-counter-

---

1. Paragraph 18 of the executory agreement becomes material to this dissent only if the February 11, 1987 executory agreement is considered to be amended or modified, "by an instrument in writing signed by the party to be bound thereby," as suggested by the majority opinion. The existence of such a document is not claimed by the parties, the district court, the panel majority, nor this dissent. It has been the consistent position of this dissent and the district court that no such amendment, modification, or waiver ever occurred in the instant controversy and that no valid binding agreement was ever

consummated because of a failure of consideration and/or the seller's rejection of the February 11, 1987 proposal by the counter-offer that was never accepted by the purchasers as mandated by *Canton Cotton Mills v. Bowman Overall Company,* 149 Tenn. 18, 257 S.W. 398 (1923). Paragraph 18 is referenced in this dissent only for the purpose of reflecting but one of many reasons why the panel majority's conjectured creative opinion, which speculates a theory of a counter-counter-offer, must fall of its own weight.

offer theory, it must be read *in pari materia* with Tennessee's prevailing "mirror image rule:"

> "An acceptance, to be effectual, must be identical with the offer and unconditional...."

> "... There must be no variance between the acceptance and the offer. Accordingly a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested."

*Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 31, 257 S.W. 398, 402 (1923) (quoting 13 C.J. *Contracts* § 86 (1917); 6 R.C.L. § 31 (1915)).

Within the above limiting parameters, this court has been called upon to confine its review of the material documentation of this dispute without resort to editorial gloss and resolve an unambiguous, forthright executory agreement, dated February 11, 1987, by applying elementary principles of contract law.

The facts are simple and not in contest. The effective date of the initial executory agreement between the parties was February 11, 1987. The proposal incorporated the following material condition precedent which was the essence of consummating any formal agreement between the parties:

> (b) Purchaser agrees to pay and Seller agrees to accept payment of the Purchase Price as follows:

> (i) *Purchaser shall deposit* with Brentwood Bank in Los Angeles, California the sum of $165,000.00 as Earnest Money *to be applied to the Purchase Price at closing. Brentwood Bank shall certify to Seller in writing that it has received the Earnest Money deposit.* Unless otherwise provided herein, the Earnest Money shall represent a non-refundable deposit to be retained by Seller or applied to the Purchase Price at closing. The Earnest Money shall only be refunded to Purchaser if Purchaser notifies Seller within thirty (30) days (or such longer period as may be provided in Section 4(a) below) of the execution hereof that it does not intend to close this acquisition of the Property because of its dissatisfaction with (a) the Surveys, (b) title, (c) the documentation furnished pursuant to 10(e); or (d) the physical condition of the Property.

> (ii) Notwithstanding the foregoing, Purchaser shall have forty-five (45) days from the date of the execution hereof to use its best efforts to obtain financing for the purchase of the Property. Purchaser agrees to use due diligence in seeking such financing and shall submit to Seller copies of all applications for financing that Purchaser submits and shall keep Seller apprised from time to time during such forty-five (45) day period of its progress in obtaining financing. If, after the exercise of due diligence, Purchaser is unable to obtain financing and so notifies Seller in writing within forty-five (45) days from the date of the execution hereof, the Earnest Money shall be refunded to Purchaser. In the event that Seller has not been notified by Purchaser in writing at the end of the 30 day period in accordance with the provisions of (i) above, or at the end of the forty-five (45) day period in accordance with the provisions of this subsection (ii) of Purchaser's inability to close, Seller shall so notify Brentwood Bank in writing. Thereupon Brentwood Bank shall transfer the Earnest Money previously deposited with it to Mid–South Title Insurance Corporation in Memphis, Tennessee, to be held in escrow until Closing.

J.A. at 14 (emphasis added).

The above condition was the result of protracted negotiations between the parties.

Contrary to the above condition of the proposal, on February 13, 1987, defendant Moses, *not Brentwood Bank*, notified the seller that:

> February 13, 1987

> Union Realty Company, Ltd.

> Gentlemen:

Pursuant to Paragraph 2(b)(i) of the Purchase and Sale Agreement made by and between the Union Realty Company, Ltd. and Stephen D. Moses and Arnold L. Porath, I have this day deposited in Brentwood Bank in Los Angeles, California, the sum of $165,000 as earnest money to be applied to the purchase price at closing.

I enclose herewith the evidence of that deposit.

J.A. at 379.

The evidence of the required "deposit" was an attached xerox copy of a *nontransferable* Time Certificate of Deposit in the amount of $165,000.00, payable to Stephen Moses, with a maturity date of April 14, 1987, after which interest accruals terminated. All of the above information appeared on the face of the certificate that accompanied the Moses letter of February 13.

Brentwood Bank at no time certified, in writing or otherwise, to the seller that it had received any "earnest money" deposit as required by the terms of the February 11 proposal. In a written communique, the Bank expressly disclaimed it received any monies in conjunction with the proposal of February 11 or any other agreement or was an escrow for any funds whatsoever. In sum, the essence of Moses' action was to purchase a 60 day non-transferable certificate of deposit in the amount of $165,000.00 payable to himself, which remained in his exclusive possession and control until he cashed it upon maturity on April 14, 1987.

On February 16, 1987, three days after the Moses letter of February 13, Keith Novick, the plaintiff's general counsel, obviously aware of and concerned over the purchasers' failure to comply with the condition precedent of the proposal to deposit the $165,000.00 consideration into the designated independent depository with instructions to proceed in accordance with paragraphs 2(b)(i) and (ii) of the proposal of February 11, wrote the following letter to Moses:

Dear Stephen:

I am pleased to enclose herewith two (2) executed contracts for each of the above referenced sales.

I would request that you provide an affirmative statement from Brentwood Bank that the deposits for both contracts are held in escrow, *subject to the terms of the Contracts* and *an acknowledgement that these sums shall be delivered to the Sellers*, respectively, in the event the Sellers advise the Bank that the notice pursuant to Sections 2(b)(i) and (ii) are not received. *Execution and delivery of the Contracts are conditioned upn [sic] receipt of this statement from Brentwood Bank within five days of this date.*

J.A. at 113 (emphasis added).

The seller's concern and apprehension of the purchasers' sincerity to consummate a binding contract to purchase the property here in issue was reflected in its letter of February 16 to Moses, wherein the seller recognized the purchasers' patently apparent effort to avoid the performance dictated by the February 11, 1987 executory proposal and voiced a demand to receive, within five days, the Brentwood Bank certification that the purchasers had deposited $165,000.00 as consideration with instruction that the Bank deliver those funds directly to the seller in the event that it had not received the 30 and 45 day notices specified by paragraphs 2(b)(i) and (ii) of the executory proposal. The seller's awareness and concern was further expressed by Jack Belz, a general partner of the seller, in a letter to his counsel, Novick, dated March 8, 1987, wherein he admonished Novick, "I assume you received this—did you?" referencing Novick's anxiety of February 16 addressing the failure to receive the "affirmative statement from Brentwood Bank."

It cannot be rationally argued that, absent an affirmative written certification from the Brentwood Bank that it had received $165,000.00 in escrow funds to be disbursed in accordance with paragraphs 2(b)(i) and (ii) of the February 11, 1987 proposal, the purchase of a *non-transferable* 60 day interest-bearing certificate of

deposit by Moses, payable directly to himself upon presentation at maturity, which he retained in his possession, constituted even marginal compliance with the February 11 requirement.

The defendants, the seller's counsel, Novick, its real estate broker, Terhune, and the seller's general partner, Belz, were consciously aware that no legal contract existed as of February 16, the date of Novick's letter demanding compliance certification by Brentwood Bank because there had been a total failure of consideration to consummate the agreement. It was this failure of the defendants to comply with the condition precedent of the February 11 proposal that instigated the events that culminated in this legal action.[2]

It is equally apparent from the record that the purchasers ignored Novick's letter of February 16, without response, explana-

tion, or affirmative action that reflected an intention to conform the required $165,-000.00 payment of earnest money to the dictates of the executory proposal of February 11. The defendants also ignored the 30 and 45 day notice requirement of paragraphs 2(b)(i) and (ii).

The agreement was not thereafter directly addressed by the principals, although Terhune on his own initiative was pursuing the satisfaction of the "due diligence" requirements. Direct communications between the parties remained dormant for 49 days until Novick's letter of April 6, 1987, wherein he advised the purchasers that he had not received a response to his letter of February 16, 1987. Defendant Moses explained the reasons for his failure to pursue the purchase of the properties after Novick's letter of February 16 in a letter to Belz dated April 24, 1987, wherein Moses wrote:

---

**2.** As an aside, the panel majority, in an effort to justify the absence of consideration to support a binding agreement to purchase, conjectures that

> Mr. Moses would be hard pressed to deny that he deposited $165,000 as earnest money pursuant to the agreement, given the February 13 letter in which he explicitly told the seller that "[p]ursuant to [the agreement] I have this day deposited in Brentwood Bank ... the sum of $165,000 as earnest money...." We are not prepared to say that Mr. Moses was practicing sleight of hand here, trying to trick the seller into thinking it was bound to convey the property but secretly planning to take the earnest money back if he ultimately decided, notwithstanding the availability of financing, that he preferred not to honor this commitment to purchase the property or let the seller have the earnest money. It is true that Mr. Moses failed to get his bank to provide the agreed certificate, but it is also true that he tendered an explanatory letter from the bank and that he expressed the hope that the seller would accept the letter in lieu of a proper certificate. The seller, as we have seen, did so.

Maj.Op. at 721 n. 6.

The majority's conclusory assessment of Moses' intentions is sheer speculation that is contradicted by the record of Moses' obvious material departure from the mandates and time constraints of the February 11 proposal. It is true, as suggested by the majority, that Moses was not "practicing sleight of hand here, trying to trick the seller into thinking it was bound to convey the property but *secretly* planning to take the earnest money back if he ultimately decided, notwithstanding the availability of financing, that he preferred not to honor his commitment

to purchase the property or let the seller have the earnest money," *because he made no secret of his intentions* to avoid the restrictive requirements of the executory proposal to irrevocably commit $165,000.00 to the time constraints of ¶¶ 2b(i) and (ii) of the executory proposal. Those intentions were obvious from his letter of February 13, 1987, and the attached certificate of deposit. Those intentions were recognized and understood by the seller, its legal counsel, Novick, and real estate broker, Terhune.

The buyers wanted an unlimited option to either purchase the property or walk away from the transaction. This the seller had refused, as is evident from a letter signed by Terhune, the seller's real estate broker, addressed to the defendants and dated May 26, 1987:

> No one is more regretful than I am that we couldn't close these properties. I truly believe you would have been very happy with the results. [I] [sic] worked as hard as I could to put the thing together, but *could not overcome the reticence of Mr. Belz to give you an unlimited option.*

J.A. at 331 (emphasis added).

When it became apparent to the purchasers that the desired unlimited option they had requested was not forthcoming and the seller was insisting upon tightening the compliance requirements of ¶¶ 2(b)(i) and (ii) of the proposal, as reflected in Novick's letter of February 16, they walked away from the proposed sale without attempting to further comply with either Novick's letter or the February 11 proposal. After Novick's letter, the only interested party to the transaction was the seller and its broker who was attempting to keep the negotiations alive and earn his $250,000.00 real estate broker's commission.

Dear Mr. Belz:

This letter is with reference to that "Apartment Purchase/Sale Agreement" between you as Seller and the undersigned, by themselves or as Agents, as Purchasers.

We understand that the agreement was never actually effective since we declined to make a deposit in form acceptable to you. We had several such conversations with Mr. Keith Novik [sic].

We were encouraged by your broker, Mr. Dennis Terhune, to try nevertheless to continue to pursue financing, which appeared to be obtainable through his services and contacts. He was, he told us, in constant communication with you, and we believed you understood the status. We certainly did not understand, therefore, that the time periods in the agreement had any applicability and, if it did, you were aware of our inability to obtain financing for the property within the time set forth therefor in the Agreement. I was therefore surprised to learn from Brentwood Bank of Mr. Novik's [sic] attempt to obtain deposit funds from them, and reject and deny such a claim.

J.A. at 330.

Terhune's efforts during this interim period to facilitate the satisfaction of "due diligence" requirements in the event a binding agreement materialized, albeit without objections from the defendants, were undertaken at his own expense. His efforts, unfortunately, were totally without legal significance because no agreement between the parties materialized.[3]

Assuming, *arguendo*, that the failure of consideration to consummate a binding legal agreement is not dispositive of this action, the plaintiff nevertheless cannot, under Tennessee and other existing legal precedent, prevail.

Pursuant to Tennessee's "mirror image rule," it is settled law that

"[a]n acceptance, to be effectual, must be identical with the offer and unconditional. . . ."

". . . There must be no variance between the acceptance and the offer. Accordingly, a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested."

*Canton Cotton Mills,* 149 Tenn. at 31, 257 S.W. at 402 (quoting 13 C.J. *Contracts* § 86 (1917); 6 R.C.L. § 31 (1915)). The February 11 proposed agreement provided that if the mandated 30 and 45 day notices were not forthcoming pursuant to paragraphs 2(b)(i) and (ii) of the February 11, 1987 proposal, the deposited earnest money was to be transferred to Mid–South Title to be held in escrow. Novick's letter of February 16, on the other hand, directed that, in the event those notices were not given, the money was to be transferred directly to plaintiff. Also significant is the letter's requirement that Brentwood Bank provide the plaintiff with an affirmative commitment that it would pay the $165,000.00 directly to the seller if the notices were not timely received. The February 11 executory proposal contained no such requirement but simply stated that the Bank would give plaintiff written notice of the receipt of the earnest money. Moreover, the letter of February 16 expressly conditioned the execution and delivery of the February 11 proposed contract upon Brentwood Bank's total compliance with the outlined requirements within five days of February 16, 1987, a time requirement that had not been incorporated in the February 11 executory proposal. Accordingly, the February 16, 1987 Novick letter demanded material amendments to the executory proposal of February 11 as conditions precedent to consummating an agreement, all of which conditions were rejected by the purchasers.

---

**3.** As noted by the panel majority, various applications were filed over the signature of the buyers for approval of industrial bonds to finance the project and that various efforts were pursued to implement the "due diligence" requirements of the executory proposal. However-er, as disclosed by the record and the defendants' letter of April 24, those efforts were initiated and implemented by the seller's broker, Dennis Terhune, who was diligently seeking to protect a $250,000.00 real estate commission that would result from the sale.

Novick's letter of February 16 was, pursuant to the "mirror image rule" enunciated in *Canton Cotton Mills*, a rejection of the February 11 executory proposal, which put " '*an end to the negotiation* unless the party who made the original offer [the defendants] renews it, or assents to the modifications as suggested.' " *Canton Cotton Mills*, 149 Tenn. at 31, 257 S.W. at 402 (quoting 6 R.C.L. § 31 (1915)).

In the instant case, the defendants had neither assented to the demanded amendments nor had they renewed the February 11, 1987 executory proposal. The defendants walked away from the transaction, terminated negotiations with the seller, and made no further efforts to renew those negotiations. On February 16, 1987, the February 11, 1987 proposed executory agreement was dead-in-the-water and had been abandoned by the buyers. The defendants made no direct overture to renew negotiations with the seller, albeit they did not object to Terhune's activities to pursue the consummation of a contract of sale and realize his $250,000.00 real estate commission—which, of course, he was unable to accomplish.

After 49 days of silence had elapsed from the seller's counter-offer of February 16, 1987, Novick wrote Moses on April 6, 1987, urging him to comply with paragraphs 2(b)(i) and (ii) of the proposed February 11 executory agreement that he, Novick, had terminated by his counter-offer dated February 16, 1987, which solicitation had been ignored by the defendants. The April 6, 1987 letter directed that the "sums [$165,000.00] would be delivered to the sellers" as directed in his rejected counter-offer of February 16, 1987. It stated:

Dear Steven:

I have yet to receive the affirmative statement from Brentwood Bank that the deposits for both contracts are held in escrow subject to the terms of the contracts and the acknowledgment *that these sums would be delivered to the sellers* in the event the bank is advised that the notice pursuant to Section 2(b)(i) and (ii) were not received.

This is probably an oversight and I would request that you provide me with this letter as soon as possible.

J.A. at 114 (emphasis added).

Novick's letter of April 6 changed nothing between the parties. The proposed executory contract of February 11 either had never been consummated because of the defendants' refusal to commit the required $165,000.00 consideration in accordance with the requirements of the initial February 11 proposal, and/or it had been terminated by Novick's February 16 rejection of the offer which put an end to the negotiations, pursuant to *Canton Cotton Mills*. Under either theory, the end result was the same. *There was no contract between the parties on April 6.* The February 11 proposal and Novick's counter-proposal of February 16 were no longer on the table and *all negotiations were at an end* " 'unless the party who made the original offer [the defendants] renews it, or assents to the modification.' " *Canton Cotton Mills*, 149 Tenn. at 31, 257 S.W. at 402 (quoting 6 R.C.L. § 31 (1915). The defendants did neither. *Accordingly, on April 6, the seller was without authority to either invoke or exercise paragraphs 2(b)(i) and (ii) of the non-existent and/or terminated February 11 executory proposal or to direct the disposition of the $165,000.00, even if it had been in the possession of Brentwood Bank.* It would appear that the panel majority concedes this point in Section II of its disposition, albeit with equivocation and speculation that does not find support in the language of the letter itself. The majority muses:

Citing Tennessee's "mirror image rule," under which "[a]n acceptance, to be effectual, must be identical with the offer and unconditional," *Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 31, 257 S.W. 398 (1923), the district court reasoned that because Mr. Novick's letter of February 16 purported to condition the execution and delivery of the contract upon receipt within five days of a statement from Brentwood Bank differing somewhat from the requirements of the contract, the letter represented a counter-offer that prevented the contract

from going into effect; that a counter-offer has the effect of a rejection and terminates the offeree's power to accept the original offer; and that because the buyers never accepted the counter-offer, the contract never came into existence.

*This reasoning may be correct as far as it goes, but it does not go far enough.* If Mr. Novick's letter of February 16 was a counter-offer (i.e., if the contract had not already become effective by February 16), it is clear that the counter-offer was renewed—without any five-day limitation—on April 6, 1987, when Novick again requested Moses to provide the "affirmative statement" from Brentwood Bank. And *if* the April 6 letter represented a renewed counter-offer, it is equally clear that it evoked a *counter-counter-offer from Mr. Moses on April 10.*

Maj. Op. at 719–20 (emphasis added).

In sum, the panel majority concludes that Novick's April 6 inquiry was a renewal of the seller's February 16 counter-offer which "evoked a counter-counter-offer from Moses on April 10." The conclusion is more easily articulated than justified. An unedited review of the letters contradicts the majority's interpretations.

In sequence, Novick's letter of April 6, requested an affirmative statement from Brentwood Bank that the deposits for both contracts are held in escrow subject to the terms of the contracts and the acknowledgment that these sums would be delivered *to the sellers in the event the bank is advised that the notice pursuant to Section 2(b)(i) and (ii) were not received.*

This is probably an oversight and I would request that you provide me with this letter as soon as possible.

J.A. at 114 (emphasis added).

On April 10, defendant Moses responded:
Dear Keith:
In [r]esponse [sic] to your letter of April 6, 1987, I enclose herewith a letter that Brentwood Bank wrote me some time ago and which I thought I had forwarded to you.

While it is not what you wanted, I hope that by implication, it accomplishes what you want.

J.A. at 383.

Attached to the defendants' response was the Brentwood Bank's refusal to confirm that Moses had, on February 13, or at any other time, deposited $165,000.00 as earnest money pursuant to the proposal of February 11, 1987. Of significance, the Bank's letter did not allude to Novick's counter-offer of February 16, which apparently had not been brought to its attention when Moses requested its initial certification as required by paragraphs 2(b)(i) and (ii) of the February 11 proposal. The Bank's response was confined to addressing only the affirmative statement required by the February 11 initial proposal. It read in pertinent part as follows:

Dear Mr. Moses:
You have asked that we write a letter to Union Realty confirming that on February 13, you established in this bank a $165,000 certificate of deposit that related to a purchase and sale agreement with Union Realty.

Unfortunately, we have been advised that because of ever-increasing problems with lender's liability, we cannot provide you or Union Realty with any writing to the effect that the $165,000 certificate of deposit [dated February 13, 1987] related to the purchase and sale agreement with Union Realty, or that it constituted a good faith deposit under that agreement [of February 11, 1987].

J.A. at 384.

The Bank's refusal to provide an affirmative statement that Moses had escrowed earnest money in the amount of $165,-000.00 to be transferred to Mid–South Title Insurance Corporation pursuant to paragraph 2(b)(ii) of the February 11 proposal, i.e.,

[i]n the event that Seller has not been notified by Purchaser in writing at the end of the 30 day period in accordance with the provisions of (i) above, or at the end of the forty-five (45) day period in accordance with the provisions of this subsection (ii) of Purchaser's inability to

close, Seller shall so notify Brentwood Bank in writing. Thereupon Brentwood Bank shall transfer the Earnest Money previously deposited with it to Mid–South Title Insurance Corporation in Memphis, Tennessee, to be held in escrow until Closing,

was obviously not the negative response that the seller "wanted" to the February 11 proposal.

Equally apparent from Brentwood Bank's refusal to certify the defendants' compliance with paragraphs 2(b)(i) and (ii) of the initial February 11 proposal was a refusal by "implication" to provide the certification demanded by the seller's counter-offers dated February 16 and April 6, to which Moses was responding, which required the Brentwood Bank's commitment to deliver deposited earnest money, which it had never received, directly to the seller instead of to Mid–South Title Insurance Corporation in the event of a breach of paragraphs 2(b)(i) and (ii), as provided in the February 11 proposal. Accordingly, the "implication" of Moses' response to the seller's April 6 inquiry was the logical inference that the Bank would not provide the subsequent certifications demanded by the seller's February 16 and April 6 letters, which was drawn from the Bank's earlier refusal to certify Moses' compliance with the February 11, 1987 proposal.

Although Brentwood Bank's implied refusal to provide the seller with a statement affirming the defendants' compliance with the seller's counter-proposals of February 16 and April 6 was not the negative response that the seller expected, it nevertheless clearly conveyed the Bank's implied intention not to certify the defendants' compliance with paragraphs 2(b)(i) and (ii) of the February 11 initial proposal or the February 16 and April 6 counter-offers.

The panel majority conjectures that the defendants' letter of April 10, with the attached Brentwood Bank refusal to certify the defendants' compliance with paragraph 2(b)(ii) of the February 11 proposal and its implied refusal to honor the seller's February 16 and April 6 directions to deliver $165,000.00 of earnest money directly to it

instead of Mid–South Title Insurance Corporation in the event of a breach of paragraph 2(b)(ii) of the February 11 proposal, constituted a counter-counter-offer from the defendants.

Initially, it should be noted that in arriving at its conclusion the panel majority's reasoning reflects an overreaching of Supreme Court direction limiting lower court evidentiary considerations in summary judgment dispositions as enunciated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), wherein the Court stated:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes [v. S.H. Kress and Co.],* 398 U.S. [144], at 158–159, 90 S.Ct. [1598], at 1608–1609 [, 26 L.Ed.2d 142]. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948).

*Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

In the instant summary judgment resolution, the majority has extended, without explanation, its interpretation of the available evidence beyond the admonitions of the Supreme Court by conjecturing multiple factual unsupportable conclusions from the Moses letter of April 10. It interpreted the language of the letter, "While it [the attached Brentwood Bank letter refusing to certify the defendants' compliance with the initial February 11 proposal] is not

what you wanted, I hope by implication, it accomplishes what you want," to be a proposal "that the parties stick to the February 11 contract as signed, with Union Realty [by] waiving the bank certification requirement," or in the alternative, to be an offer "accepting the bank's March 23 letter as complying with it [the February 11, 1987 proposal] 'by implication.'" Maj.Op. at 721. Two highly implausible conclusions anchored in sheer speculation.

On its face, the majority's alternate conjectures disclose an impermissible drawing of inferences from facts, making credibility determinations and weighing the evidence in arriving at its decision—all of which has been placed beyond its authority by the Supreme Court.

Assuming, *arguendo*, that the two controversial lines of the defendants' letter of April 10 constituted a counter-counter-offer as erroneously characterized by the panel majority, the majority's disposition is nevertheless flawed because it fails to address basic requirements integral to a valid offer and acceptance necessary to support a contract. Mindful of the fact that the February 11 proposal had either never been consummated because of the defendants' failure to deposit the $165,000.00 consideration with the Brentwood Bank as required by paragraphs 2(b)(i) and (ii) of that proposal and/or the seller's rejection/termination of that proposal by its counter-offer of February 16, the characterized Moses counter-counter-offer of April 10 to purchase extended no definitive identifiable terms and/or conditions of purchase. Was Moses offering to purchase the seller's property if the latter waived the Brentwood Bank certification requirement to deposit $165,-000.00 as consideration with the Bank to be delivered to Mid–South Title Insurance Corporation upon failure of the defendants to comply with the 30 and 45 day notice requirements incorporated into paragraphs 2(b)(i) and (ii) of the February 11 proposal with which, incidentally, Moses had previously refused to comply? Was he offering to purchase if the seller waived the 30 and/or 45 day notices of the February 11 proposal? Was he offering to purchase if the seller waived payment of the $165,-

000.00 directly to the seller in the event of a notice of default? Or was Moses offering to purchase the property if Belz would give him his requested unlimited option, which Terhune was initially unable to obtain from Belz? The elements of the characterized counter-counter-offer are left suspended in a state of limbo.

Moreover, the panel majority's envisioned Moses counter-counter-offer is without an identifiable effective date. Logic dictates that, if the effective date of the Moses counter-counter-offer was intended to be retroactive to February 11, as inferred by its initially conjectured interpretation "that the parties stick to the February 11 contract as signed," or its second conjectured interpretation "accepting the bank's March 23 letter as complying with it 'by implication,'" and embrace the paragraph 2(b)(i) and (ii) expired 30 and 45 day March 13 and 28 notice dates, the proposal was beyond performance and was tantamount to a confession of judgment conceding the seller's claim to the $165,000.00 consideration—hardly a reasonable supportable inference to be drawn from the defendants' demonstrated adversary stance in contesting this litigation. On the other hand, if the Moses counter-counter-offer was intended to be prospective from April 10, the date of his letter, or upon April 15, the date of the seller's purported acceptance of his counter-counter-offer, then in that event, the 30 and 45 day notice requirements of the February 11 proposal would not have expired until May 11 and 26, respectively, and the seller's notice of default would have been premature and without legal affect.

The seller's April 15 purported "acceptance" of the defendants' April 10 purported offer, whatever it may have been, is problematical, if in fact any "acceptance" occurred. The record discloses no formal written acceptance by mail or otherwise that was communicated to the defendants pursuant to the dictates of paragraph 18 of the original February 11 proposal and/or in accordance with elementary horn-book legal requirements of basic contract law. The seller's April 15 letter was not ad-

dressed to the defendants, nor were the defendants copied with the notice. The April 15 characterized "acceptance" of the defendants' purported April 10 offer, whatever it may have been, was addressed to the Brentwood Bank, a non-party in interest which, by choice and in writing, had directly rejected and/or repudiated the mandates of the February 11 proposal and, by implication, the seller's February 16 and April 6 letters to become an escrow agent for the transaction.

Finally, the panel majority's alternate conclusion that on April 10, Moses was proposing "that the parties stick to the February 11 contract, as signed with Union Realty, [by] accepting the bank's March 23 letter as complying with it 'by implication'" is equally speculative and finds no support in the Moses April 10 letter to which it is attributed nor in the attached Brentwood Bank letter. The Bank letter simply refused to provide the seller with certification that Moses had complied with paragraphs 2(b)(i) and (ii) of the February 11 proposal and refused to act as an escrow agent pursuant to that proposal. It also conveyed, by implication, its refusal to act as an escrow agent as directed by the seller's February 16 and April 6 counter-offers and deliver the $165,000.00 consideration directly to the seller in the event of a 45 day notice of default pursuant to paragraph 2(b)(ii) of the February 11 proposal.

In sum, the panel majority's resolution conjures a black hole of ambiguity with inexplicable problems that remain without solutions.

As discussed in footnote 1 of this dissent and contrary to the convoluted reasoning of footnote 6 of the majority opinion that the dissent "presupposes that the contract had already become effective by February 16," both the trial court and the dissent consistently have concluded that a contract between the parties was never consummated because of: 1) a failure of consideration; and/or 2) a rejection of the February 11, 1987 proposal by the seller's February 16, 1987 counter-offer. *See Canton Cotton Mills*, 149 Tenn. at 31, 257 S.W. at 402.

The existing legal precedent and the reasoning advanced by the trial court and the dissent are dispositive of the issue joined by this appellate review. The panel majority has dismissed both issues with profound silence and a casual, "we do not find this analysis persuasive."

Again, contrary to the majority's interpretation of the dissent, paragraph 18 of the February 11, 1987 proposal would become material to a resolution of this controversy only if the panel majority's creative conjectures found legal and factual support in the evidence presented with the parties' cross-motions for summary judgment. As hereinbefore discussed, the relevance of paragraph 18 to a resolution of this controversy within the context of the majority's counter-counter-offer theory is but one of many infirmities of the majority's reasoning. The majority has not enlightened, nor attempted to enlighten, the parties or the trial court with findings of fact or conclusions of law from which it derives its disposition.

Although solicited by the dissent, the majority has advanced no cogent reason for ignoring Tennessee law as enunciated in *Canton Cotton Mills*, which is dispositive of this case. It has refused to address elementary contract law principles of mutuality, offer, and acceptance. It has refused to fix the effective date or the terms and conditions of its creative conjectured counter-counter-offer, as well as the manner and date of the seller's acceptance of that purported counter-counter-offer. The majority opinion has proffered no justification for exceeding acceptable constraints and parameters placed upon lower court evidentiary considerations in summary judgment dispositions as dictated by the Supreme Court in *Anderson, Celotex* and progeny. The parties and the trial court should be accorded an explanation for the majority's disparate departures from basic contract law and Tennessee legal precedent if its opinion is to be assigned any credibility.

Because the initial executory proposal of February 11, 1987 was never consummated due to a failure of consideration and/or was terminated and rejected by the seller's February 16, 1987 counter-offer, which put an end to the negotiations and caused the defendants to abandon the original offer to purchase dated February 11, 1987, which

offer was not renewed by the defendants; because the defendants thereafter never assented to the seller's February 16 and April 6, 1987 counter-offers; because the defendants thereafter never presented any offer, let alone a definitive offer, identifying the effective date of a counter-counter-offer or its terms and conditions reflecting a mutuality of understanding, i.e., a meeting of the minds; because the seller never communicated any acceptance to the purchasers' counter-offer, if one existed; and because the seller, on April 15, 1987, had no claim against the Brentwood Bank or the defendants for the $165,000.00 consideration, which funds had never been deposited with it as an escrow agent pursuant to the February 11 or any other agreement, I must respectfully dissent from the majority disposition.[4]

I would, for the reasons stated herein, including those expressed by the district judge, AFFIRM the trial court's decision.

4. In its latest response, the majority opinion continues to evade the material inquiries posed by this dissent and continues to repeat and rely upon the same self-serving conjectures, specula-tions and imagery it has advanced in earlier draft resolutions without referencing either law or fact to justify a creative disposition which ignores elementary principles of contract law.