Gerald J. BUESING, Plaintiff,

v.

UNITED STATES, Defendant.

No. 96–70T.

United States Court of Federal Claims.

Jan. 13, 1999.

Jeffrey A. McKee, Susemihl & Davis, Phoenix, AZ, attorney of record for plaintiff.

Elizabeth Diane Seward, Court of Federal Claims Section, Tax Division, Department of Justice, Washington, D.C., with whom were Thomas D. Sykes, Mildred L. Seidman, Chief, Court of Federal Claims Section and Loretta C. Argrett, the Assistant Attorney General, attorneys of record for defendant.

## OPINION

HORN, Judge.

The above-captioned case comes before the court on the defendant's motion to dismiss pursuant to pursuant to Rules 12(b)(1) and 12(h)(3) of the Rules of the United States Court of Federal Claims (RCFC), and on the defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment pursuant to RCFC 56. The plaintiff filed a complaint against the United States which seeks to enforce an alleged settlement agreement between the plaintiff and the Internal Revenue Service, to have federal tax liens released, and to recover the net proceeds of $78,008.38 from the sale of his house as part of a bankruptcy discharge, after the tax lien payment of $30,000.00.

## FACTS

On March 10, 1990, plaintiff Gerald Buesing was married to Laura Michael (Ms. Michael–Buesing). In March 1993, plaintiff and Ms. Michael–Buesing purchased, as husband and wife, a residence at 1917 East Clubhouse Drive in Phoenix, Arizona (the Clubhouse Drive property). In August 1993, Ms. Michael–Buesing informed plaintiff that she wanted a divorce.

On August 24, 1993, after plaintiff and Ms. Michael–Buesing had separated, and using a power of attorney Ms. Michael–Buesing had previously given to him, plaintiff prepared and recorded a quit claim deed for and on behalf of Ms. Michael–Buesing, in which she abandoned all right, title, and interest in and to the Clubhouse Drive property. Also on August 24, 1993, plaintiff recorded a declaration of homestead respecting the Clubhouse Drive property.

In September 1993, Ms. Michael–Buesing filed a divorce petition in Maricopa County, Arizona. Throughout the divorce proceedings, Ms. Michael–Buesing claimed a one-half interest in the Clubhouse Drive residence.

Plaintiff was advised by counsel that the quit claim deed was probably not enforceable. Thereafter, plaintiff did not contest Ms. Michael–Buesing's one-half interest in and to the Clubhouse Drive property.

On October 19, 1993, the Internal Revenue Service (IRS) recorded a Notice of Federal Tax Lien in Maricopa County, Arizona respecting assessed and unpaid income taxes, penalties and interest totaling $105,369.00 that plaintiff owed for taxable years 1987 through 1989. The federal tax lien attached to all of plaintiff's real and personal property.

On January 18, 1994, plaintiff filed a petition under Chapter 11 of the United States Bankruptcy Code seeking protection from his creditors. In March 1994, plaintiff's bankruptcy case was assigned to Revenue Officer William Unger of the IRS for resolution of plaintiff's unpaid income taxes for 1987 through 1989.[1] On September 9, 1994, the United States Trustee moved the bankruptcy court to dismiss plaintiff's Chapter 11 case or convert it to a Chapter 7 case. Plaintiff filed an objection to the motion on September 14, 1994. On October 24, 1994, after a hearing, the bankruptcy court granted the trustee's motion and dismissed plaintiff's Chapter 11 case for failure to prosecute and comply with administrative duties. Thereafter, on November 28, 1994, the trustee and plaintiff filed a stipulation for an order to reinstate the Chapter 11 proceedings, and on December 6, 1994, the bankruptcy court entered an order reinstating plaintiff's Chapter 11 case.

Revenue Officer Unger notified plaintiff's counsel by letter dated January 23, 1995, that plaintiff's income taxable years 1987 through 1989 met the requirements for discharge from personal liability in his Chapter 11 proceeding. Revenue Officer Unger stated that after the Bankruptcy Court issued an order discharging the taxes, and collection was made from plaintiff's equity in his real and personal property to which the federal tax lien attached, any remaining tax debt would be abated.

Plaintiff initiated discussions with the IRS to determine the extent and value of the real and personal property to which the federal tax lien respecting his 1987 through 1989 tax liabilities could attach. Upon Revenue Officer Unger's request, plaintiff provided to the IRS information and documentation regarding the value of his business, automobile, and residence. With regard to the value of the Clubhouse Drive residence, plaintiff provided comparable sales information to the IRS showing that similarly situated residential property had a market value of $300,000.00. During the negotiations, plaintiff represented to the IRS that his wife had a one-half interest in the Clubhouse Drive property, pursuant to Arizona community property law. Plaintiff also represented to Revenue Officer Unger that he wanted to keep his home. Based on the comparable sales figures and plaintiff's representation that Ms. Michael–Buesing held a one-half interest in the Clubhouse Drive property, Revenue Officer Unger believed that the value of plaintiff's real and personal property to which the federal tax lien could attach was $30,000.00.

Plaintiff, by letter dated March 8, 1995, made alternative offers to the IRS to secure the release of the federal tax lien in dispute. The offer at issue in the instant case provided that plaintiff would pay the IRS $30,000.00 within 90 days of IRS acceptance of

---

1. A discharge in bankruptcy operates to prohibit the IRS from collecting a tax debt as a personal liability of the taxpayer pursuant to 11 U.S.C. § 524(a)(2) (1994), which addresses the "Effect of Discharge:"

(a) A discharge in a case under this title—

\* \* \* \* \* \*

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; ...

However, the debtor's property, including the plaintiff's exempt property such as the Clubhouse Drive residence in the instant action, remains liable for a debt secured by a tax lien of the IRS pursuant to 11 U.S.C. § 522(c)(2)(B) (1994) which addresses "Exemptions:"

(c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except—

\* \* \* \* \* \*

(2) a debt secured by a lien that is—

\* \* \* \* \* \*

(B) a tax lien, notice of which is properly filed; ...

plaintiff's offer to buy out the federal tax lien on his property. The letter, written by plaintiff's counsel, states:

This correspondence is to confirm that the Internal Revenue Service has determined and agreed that Mr. Buesing is entitled to a discharge regarding, and is relieved of personal liability for, personal income tax liabilities for the tax years 1987, 1988 and 1989, subject to obtaining an Order Granting Discharge from the Bankruptcy Court. For ease of reference and your acknowledgment and understanding, I have enclosed your letter dated January 23, 1995 stating and acknowledging that the IRS will not contest the dischargeability of Mr. Buesing's Form 1040 tax liabilities for the years 1987, 1988 and 1989.

This shall also constitute an offer in compromise of all Federal Tax Levies and Liens on Mr. Buesing's real and personal property, including (but limited to) his equity in his personal residence and the value of his stock in Buesing Corporation. As you know, these Federal Tax Levies and Liens encumber Mr. Buesing's real and personal property to the extent of the above-referenced 1987, 1988 and 1989 tax liabilities.

In full satisfaction, extinguishment, and release of these Federal Tax Levies and Liens, Mr. Buesing makes the following alternative offer:

1. At Mr. Buesing's behest, Buesing Corporation will immediately relinquish to the IRS $100,000.00 of Net Operating Losses (NOLs) which it presently retains, and cooperate in reasonable measures to insure that Buesing Corporation does not attempt to utilize said NOLs; *or* (if, and only if, Option One is not accepted by the IRS)

2. $30,000.00 in cash within 90 days of IRS acceptance, which amount is comprised of $28,600.00 for Mr. Buesing's equity in his home and $1,400.00 representing Mr. Buesing's ownership interest in Buesing Corporation.

We respectfully request a[n] expeditious response to this alternative offer by the IRS. Thank you for your professional courtesies and manner in this proceeding.

On March 15, 1995, prior to receiving any response to his offer and without notice to the IRS, plaintiff signed an agreement with a real estate agent to list the Clubhouse Drive property for sale at $339,900.00.

On March 22, 1995, Revenue Officer Unger discussed with plaintiff's counsel Unger's proposal that plaintiff obtain a discharge from a Chapter 7 proceeding and then buy out the IRS's lien interest in his property. Revenue Officer Unger formally responded to plaintiff's offer by letter dated March 28, 1995, wherein he agreed that the value of the real and personal property to which the federal tax lien attached was $30,000.00. He stated that following plaintiff's discharge from a Chapter 7 proceeding and plaintiff's payment of $30,000.00, plaintiff's remaining tax liabilities for 1987 through 1989 would be abated and the lien released. The letter from the IRS, signed by Revenue Officer Unger, states:

The Internal Revenue Service agrees that the value of the real and personal property to which our Notice of Federal Tax Liens attach is $30,000.00. Following Chapter 7 discharge by the court and receipt of $30,000.00, the 1987, 1988, and 1989 income tax liabilities of the debtor will be discharged and the Notice of Federal Tax Liens will be released.

This is a procedure that has several steps involving several people, so the actual release will not appear at the county recorders office for about 4 weeks after the discharge and money are received. Payment should be made directly to this office to minimize delay.

On April 12, 1995, the Maricopa County Superior Court entered plaintiff and Ms. Michael–Buesing's consent judgment and decree of dissolution of marriage. The consent judgment stated that the Clubhouse Drive property was plaintiff's sole and separate property and was confirmed to him. The consent judgment provided further that plaintiff was to pay Ms. Michael–Buesing $5,000 on or before March 31, 1995, and $25,000.00 upon the sale of the Clubhouse Drive property. In March 1995, at the time

of the exchange of letters between plaintiff and the IRS respecting the buy-out of the IRS lien on plaintiff's property, plaintiff's bankruptcy proceeding was still in Chapter 11.

Plaintiff allegedly interpreted Revenue Officer Unger's March 28, 1995 letter as an acceptance of his offer to buy out the federal tax lien on his property. Revenue Officer Unger allegedly considered the plaintiff's March 28, 1995 letter to be a separate proposal or counteroffer. Revenue Officer Unger was unaware on March 28, 1995, that plaintiff had listed his house for sale on March 15, 1995, for $339,900.00.

On April 27, 1995, the bankruptcy court entered an order converting plaintiff's case to a Chapter 7 proceeding. On May 28, 1995, plaintiff received an offer of $330,000.00 on the Clubhouse Drive property; closing was scheduled for June 16, 1995. On or about June 16, 1995, plaintiff's attorney called the IRS to inform them of the sale of the property. In order for the sale to close, plaintiff asked the IRS to release its lien on the property and to accept $30,000.00 from the proceeds of the sale.

In reviewing the preliminary title report on the Clubhouse Drive property, the IRS learned of the quit claim deed filed in 1993 by which plaintiff transferred Ms. Michael-Buesing's one-half interest in the house to himself. The IRS also learned that the house was to sell for $30,000.00 more than its estimated value per the comparable sales data provided by plaintiff on or about January 30, 1995. The IRS refused to release its lien because plaintiff had not obtained a discharge from his Chapter 7 proceeding, and because the value of plaintiff's property in which the IRS had a lien interest exceeded the $30,000.00 estimated value derived from plaintiff's representations and documentation.

Plaintiff understood that the IRS was not required to release its lien because he had not obtained a discharge from the Chapter 7 proceeding. On June 14, 1995, plaintiff filed an emergency motion with the bankruptcy court to abandon the exempt homestead (Clubhouse Drive) property from the Chapter 7 estate. On the same date, the court entered an order abandoning the Clubhouse Drive property from plaintiff's estate.

On June 16, 1995, plaintiff attempted to tender to the IRS a cashier's check for $30,000.00 to secure a release of the lien on the Clubhouse Drive property. The IRS refused to accept the check. Revenue Officer Unger, by letter dated June 19, 1995, notified plaintiff that he was withdrawing his March 28, 1995 proposal to release the lien on plaintiff's property if plaintiff obtained a discharge from his Chapter 7 bankruptcy proceeding and paid $30,000.00.

The sale of plaintiff's home closed on June 29, 1995. The federal tax lien attached to the net sale proceeds of $78,008.38, which were deposited in escrow pursuant to an agreement between the IRS and plaintiff as provided by 26 U.S.C. § 6325(b)(3) (1994).[2] On July 14, 1995, according to the joint stipulations submitted by the parties, the plaintiff filed a complaint against the IRS in the United States Bankruptcy Court for the District of Arizona "seeking a declaratory judgment regarding agreement determining extent of federal tax liens; and for breach of agreement and specific performance of agreement respecting the IRS's refusal to accept his $30,000.00 payment and release its lien," in an action styled *In re Buesing, Gerald J. Buesing v. United States,* Case No. B-94-0538-PHX-RGM, Adversary Proceeding No. 95-500.

On July 28, 1995, the United States moved to dismiss plaintiff's complaint in the United States Bankruptcy Court for the District of Arizona for lack of jurisdiction. On Decem-

---

**2.** The applicable statute, 26 U.S.C. § 6325, titled "Release of lien or discharge of property," states in relevant part:

 **(b) Discharge of property.—**

 * * * * *

 **(3) Substitution of proceeds of sale.—**Subject to such regulations as the Secretary may prescribe, the Secretary may issue a certificate of discharge of any part of the property subject to the lien if such part of the property is sold and, pursuant to an agreement with the Secretary, the proceeds of such sale are to be held, as a fund subject to the liens and claims of the United States, in the same manner and with the same priority as such liens and claims had with respect to the discharged property.

ber 12, 1995, the United States' motion was granted, and plaintiff's complaint was dismissed. On January 10, 1996, plaintiff was discharged from his Chapter 7 proceeding.

The complaint in the instant action was filed in the United Stated Court of Federal Claims filed on February 7, 1996, seeking to recover the net proceeds, $78,008.38, from the sale of his house as part of a bankruptcy discharge and after a tax lien payment of $30,000.00 to the IRS under an alleged contract arising from a settlement agreement between the plaintiff and the Internal Revenue Service. The defendant states that pursuant to 26 U.S.C. § 6321 (1994)[3] and 26 U.S.C. § 6322 (1994),[4] the United States is entitled to retain the entire net proceeds of $78,008.38.

### DISCUSSION

The defendant filed a motion to dismiss arguing that a contract was not formed between Buesing and the IRS regarding the tax lien and that plaintiff improperly seeks a remedy not available in this court, specifically, declaratory relief or specific performance. In the alternative, the defendant filed a motion for summary judgment, arguing that any contract entered into by the parties is voidable on the grounds that material misrepresentation or unilateral mistake occurred.

The plaintiff responded to the motion to dismiss, and filed a cross-motion for summary judgment, asserting that the parties entered into a contract arising out of a settlement agreement and that the plaintiff seeks money damages stemming from a failure to perform that contract. Moreover, the plaintiff argues that in the event the court determines there was a contract, but finds the government's argument regarding material misrepresentation and unilateral mistake worthy of consideration, that summary judgment is not appropriate as facts material to the formation of a contract would be genuinely in dispute.

### I. Motion to Dismiss

The court first considers defendant's motion to dismiss, pursuant to RCFC 12(b)(1), for lack of subject matter jurisdiction regarding plaintiff's claim. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1),[5] has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v.*

---

3. The applicable statute reads:

 **§ 6321. Lien for taxes**
 If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.
 26 U.S.C. § 6321.

4. The applicable statute reads:

 **§ 6322. Period of lien**
 Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.
 26 U.S.C. § 6322.

5. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 12(b)(1) and RCFC 56, discussed below. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

*United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir. 1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over the plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended, 28 U.S.C.A. § 1491 (West Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan,* 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan,* 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States,* 17 Cl.Ct. 475, 479 (1989), *aff'd,* 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S. S. Corp. v. United States,* 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States,* 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

The defendant argues that the plaintiff and the IRS did not enter into an express or implied-in-fact contract respecting the release of an IRS lien on plaintiff's real and personal property in exchange for a payment of $30,000.00, pursuant to an exchange of letters because Revenue Officer Unger lacked the authority necessary to bind the government and because the IRS's responsive letter allegedly accepting the proposed offer did not mirror the terms of the plaintiff's offer. The defendant also seeks dismissal of the portion of plaintiff's complaint that appears to request declaratory relief on the grounds that this court is without jurisdiction to grant declaratory relief, except as

conferred by statute in unique circumstances not applicable in the instant case. Furthermore, the defendant seeks dismissal of the portion of plaintiff's complaint that appears to request specific performance on the grounds that the court is without jurisdiction based upon the instant facts to provide specific performance.

Plaintiff responds to the motion to dismiss by asserting that the parties entered into a contract arising out of a settlement agreement and that the plaintiff seeks money damages stemming from a failure to perform that contract. The plaintiff specifically seeks the "return of all Plaintiff's funds held by the IRS in excess of $30,000.00 in proceeds received from the sale of Plaintiff's home." The plaintiff also argues that Revenue Agent Unger had authority independently or through the review and approval process from a person with adequate authority to enter into the settlement agreement.

 Although not addressed directly by this circuit, the law regarding tax settlement agreements has been clearly articulated:

> A settlement agreement is a contract; mutual forbearance supplies the consideration. As such, we interpret its terms using general contract law principles. *Treaty Pines Invs. Partnership v. Commissioner,* 967 F.2d 206, 211 (5th Cir. 1992). If the language of the agreement is unambiguous, we will not consider any extrinsic evidence: the meaning will be determined from the terms encompassed within the proverbial four corners of the agreement. *Goldman,* 39 F.3d at 406. Where the language is not so clear, however, we will examine the language within the context of the circumstances surrounding the execution of the agreement. *Robbins Tire & Rubber Co. v. Commissioner,* 52 T.C. 420, 435–436, 1969 WL 1677 (1969).

*Estate of Kokernot v. Commissioner,* 112 F.3d 1290, 1294 (5th Cir.1997); *see also Goldman v. Commissioner,* 39 F.3d 402, 405–06 (2d Cir.1994) ("As the settlement agreement constituted a contract, general principles of contract law must govern its interpretation."); *Slovacek v. United States,* 36 Fed.Cl. 250, 256 (1996) (citing *Goldman v. Commissioner,* 39 F.3d at 405). This same legal framework has also been applied in the United States Tax Court:

> The settlement of tax cases is governed by general principles of contract law. A settlement agreement is in essence a contract. Each party agrees to concede some rights which he or she may assert against his or her adversary as consideration for those secured in the settlement agreement. *Saigh v. Commissioner,* 26 T.C. 171, 177, 1956 WL 631 (1956). In determining the prop[er] meaning of the terms of the agreement, we look to the language of the agreement and the circumstances surrounding its execution. *Robbins Tire Co. v. Commissioner,* 52 T.C. 420, 435–436, 1969 WL 1677 (1969). Generally, extrinsic evidence will not be admitted to expand, vary, or explain the terms of a written agreement unless the agreement is ambiguous. *Rink v. Commissioner,* 100 T.C. 319, 1993 WL 101372, (1993), *affd.,* 47 F.3d 168 (6th Cir.1995); *Woods v. Commissioner,* 92 T.C. 776, 780–781, 1989 WL 32907 (1989). Petitioner bears the burden of proving that his interpretation of any ambiguous contract language is correct. Rule 142(a); *Rink v. Commissioner, supra* at 326.

*Washoe Ranches #1, Ltd. v. Commissioner,* 72 T.C.M. (CCH) 1176, T.C. Memo. 1996–495, 1996 WL 634224 (1996). This court is persuaded of the rectitude of this approach and will analyze the above-captioned case using the principles of contract law.

 The jurisdiction of the United States Court of Federal Claims, with respect to contracts, however, has been found to extend only to express or implied-in-fact contracts; it does not include claims based upon contracts implied-in-law. *Hercules Inc. v. United States,* 516 U.S. 417, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996) (citing *Sutton v. United States,* 256 U.S. 575, 581, 56 Ct.Cl. 477, 41 S.Ct. 563, 65 L.Ed. 1099 (1921); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. 212, 217, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *United States v. Mitchell,* 463 U.S. at 218, 103 S.Ct. 2961); *Hatzlachh Supply Co. v. U.S.,* 444 U.S. 460, 465 n. 5, 100 S.Ct. 647, 62 L.Ed.2d

614 (1980) (citing *Alabama v. United States,* 282 U.S. 502, 507, 51 S.Ct. 225, 75 L.Ed. 492 (1931); *Goodyear Tire & Rubber Co. v. United States,* 276 U.S. 287, 292–93, 66 Ct.Cl. 764, 48 S.Ct. 306, 72 L.Ed. 575 (1928); *United States v. Minnesota Mut. Inv. Co.,* 271 U.S. at 217, 46 S.Ct. 501; *Hill v. United States,* 149 U.S. 593, 598, 13 S.Ct. 1011, 37 L.Ed. 862 (1893)). In *Hercules Inc. v. United States,* the United States Supreme Court elaborated on the distinction between an implied-in-law contract and an implied-in-fact contract:

> The distinction between "implied in fact" and "implied in law," and the consequent limitation, is well established in our cases. An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426–427, 67 L.Ed. 816 (1923). *See also Russell v. United States,* 182 U.S. 516, 530, 21 S.Ct. 899, 904, 45 L.Ed. 1210 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties—'a coming together of minds' "). By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." *Baltimore & Ohio R. Co., supra,* at 597, 43 S.Ct., at 426.

*Hercules Inc. v. United States,* 516 U.S. 417, 116 S.Ct. at 986.

In a complaint, a well pleaded allegation of an underlying express, or implied-in-fact, contract "is sufficient to overcome challenges to jurisdiction" in the United States Court of Federal Claims. *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir. 1997) (citing *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679, 686 (Fed.Cir.1992); *Gould, Inc. v. United States,* 67 F.3d 925, 929 (Fed. Cir.1995); *Do–Well Mach. Shop, Inc. v. United States,* 870 F.2d 637, 639–40 (Fed.Cir. 1989)). To establish a claim upon which relief can be granted, a plaintiff must allege the elements necessary to establish the existence of an express contract or an implied-in-fact contract. *Trauma Serv. Group v. United States,* 104 F.3d at 1325–27 (upholding dismissal for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), rather than for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1), when plaintiff's allegations were based upon claims of an express or implied-in-fact contract, but failed sufficiently to set forth the factual elements necessary to support either type of contract claim); *cf. Girling Health Sys., Inc. v. United States,* 949 F.2d 1145, 1146–47 (Fed.Cir.1991), *cert. denied,* 503 U.S. 940, 112 S.Ct. 1483, 117 L.Ed.2d 626 (1992) (dismissing case for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) when plaintiff had failed to establish the elements of a contract).

In *Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995), the United States Court of Appeals for the Federal Circuit discussed the distinction between a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4), and a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) in complaints alleging breach of contract:

> In *Spruill v. Merit Sys. Protection Bd.,* 978 F.2d 679 (Fed.Cir.1992), we discussed the differences between a dismissal for lack of jurisdiction and a dismissal for failure to state a claim upon which relief can be granted. Jurisdiction in this context refers to the power of a court to hear and decide a case—subject matter jurisdiction. *Id.* at 686. A dismissal for lack of jurisdiction means that the subject-matter of the dispute is one that the court is not empowered to hear and decide.

A dismissal for failure to state a claim, however, is a decision on the merits which focuses on whether the complaint contains allegations, that, if proven, are sufficient to entitle a party to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (A motion to dismiss for failure to state a claim should only be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [the] claim which would entitle him to relief."). In *Do–Well Mach.*

*Shop, Inc. v. United States,* 870 F.2d 637 (Fed.Cir.1989), we explained the differences between a dismissal for lack of jurisdiction and one for failure to state a claim upon which relief can be granted in the context of determining whether a time bar provision in a contract went to the jurisdiction of the forum or was a question of failure to state a claim for which relief could be granted. We said:

> The distinction between lack of jurisdiction and failure to state a claim upon which relief can be granted, is an important one: "[T]he court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy. Jurisdiction, therefore, is not defeated ... by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover...."

*Id.* at 639–40 (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946)).

*Gould, Inc. v. United States,* 67 F.3d at 929. Subsequently, in *Allen v. United States,* 100 F.3d 133 (Fed.Cir.1996), the court wrote that when a plaintiff "non-frivolously alleged a contract with the Government, and the Court of Federal Claims has jurisdiction over contract claims, there was no absence of subject matter jurisdiction" in the United States Court of Federal Claims due to its jurisdiction over contract claims. *Id.* at 135 (citing *Spruill v. Merit Sys. Protection Board,* 978 F.2d at 687–88).

■ A valid express contract requires that the following criteria have been met: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Medical Management, Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997) (citing *Thermalon Indus., Ltd. v. United States,* 34 Fed.Cl. 411, 414 (1995) (citing *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert.*

*denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Fincke v. United States,* 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982))).

■ An implied-in-fact contract can only exist in the absence of an express contract. *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970), *supplemented by Algonac Mfg. Co. v. United States,* 198 Ct.Cl. 258, 458 F.2d 1373 (1972). In order to establish jurisdiction based on an implied-in-fact contract, the plaintiff must establish the elements of a contract, including offer, acceptance, consideration, mutuality of intent, and definiteness of terms. *Girling Health Sys., Inc. v. United States,* 949 F.2d at 1146–47 (citing *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 319, 585 F.2d 493, 500 (1978); *Somali Dev. Bank v. United States,* 205 Ct.Cl. 741, 750–51, 508 F.2d 817, 822 (1974)); *see also City of El Centro v. United States,* 922 F.2d at 820 (citing *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295); *Fincke v. United States,* 230 Ct.Cl. at 244, 675 F.2d at 295 (citing *Baltimore and Ohio R.R. Co. v. United States,* 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923)); *Shearin v. United States,* 25 Cl.Ct. 294, 296 n. 5, *aff'd,* 983 F.2d 1085 (Fed.Cir.1992). The plaintiff also must establish that the government official who allegedly formed the contract had actual authority to bind the government. *City of El Centro v. United States,* 922 F.2d at 820 (citing *Juda v. United States,* 6 Cl.Ct. 441, 452 (1984) (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947))); *Shearin v. United States,* 25 Cl.Ct. at 297 (citing *Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 612, 621 F.2d 1113, 1123 (1980); *Housing Corp. of Am. v. United States,* 199 Ct.Cl. 705, 711, 468 F.2d 922, 925 (1972)).

In the above-captioned case, the plaintiff has alleged the existence of the requisite elements for either an express contract or, alternatively, for an implied-in-fact contract. When deciding a motion to dismiss based on a 12(b)(1) motion for lack of jurisdiction, the

court's role is only to determine if the plaintiff has properly alleged a claim that is compensable in this forum. "[T]he law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." *Total Medical Management v. United States,* 104 F.3d at 1319 (citing *Spruill v. Merit Sys. Protection Board,* 978 F.2d at 686, *Gould, Inc. v. United States,* 67 F.3d at 929); *see Trauma Serv. Group v. United States,* 104 F.3d at 1325.

At issue in the instant action is the formation of a contract, specifically, whether the exchange of letters between the plaintiff and defendant, along with the related oral communications, created an enforceable contract. The defendant argues that there was not a meeting of the minds in that the "purported acceptance" letter of March 28, 1995 failed to "mirror the terms of the offer." In response, the plaintiff contends that the letter of March 28, 1995 reflected the oral agreement and modifications in the "interim conversation" between plaintiff's counsel and Revenue Agent Unger, following the plaintiff's offer letter of March 8, 1995.

The defendant's invocation of the "mirror image" rule bears some examination when the alleged creation of a contract through an exchange of letters and oral agreement is at issue. In the treatise *Corbin on Contracts,* the following guidance is included:

### § 3.32 Attempts by the Offeree to Restate in the Acceptance the Terms of the Offer

If the purported acceptance attempts to restate the terms of the offer, such restatement must be accurate in every material respect. It is not a variation if the offeree merely puts into words that which was already reasonably implied in the terms of the offer....

1 *Corbin on Contracts* § 3.32 (1993) (footnotes omitted); *see also Principal Mutual Life Insurance Co. v. United States,* 29 Fed. Cl. 157, 161 (1993) (finding that government letter indicated acceptance of offer proposed by plaintiff in letter and rejecting argument of variance in terms), *aff'd,* 50 F.3d 1021 (Fed.Cir.1995). The United States Court of

Claims, in *Cities Service Gas Co. v. United States,* found that a contract was formed between the government and a litigant through verbal negotiation and the exchange of letters. 205 Ct.Cl. 16, 23–24, 500 F.2d 448, 451–52 (1974).

An examination of the two letters at issue in the above-captioned case, independent of any "interim conversations," presents terms that do not appear to alter the substance of the agreement. The March 8, 1995 offer letter from plaintiff's counsel states:

This correspondence is to confirm that *the Internal Revenue Service has determined and agreed that Mr. Buesing is entitled to a discharge regarding, and is relieved of personal liability for, personal income tax liabilities for the tax years 1987, 1988 and 1989, subject to obtaining an Order Granting Discharge from the Bankruptcy Court.* For ease of reference and your acknowledgment and understanding, I have enclosed your letter dated January 23, 1995 stating and acknowledging that the IRS will not contest the dischargeability of Mr. Buesing's Form 1040 tax liabilities for the years 1987, 1988 and 1989.

This shall also constitute an *offer in compromise of all Federal Tax Levies and Liens on Mr. Buesing's real and personal property,* including (but limited to) his equity in his personal residence and the value of his stock in Buesing Corporation. As you know, these *Federal Tax Levies and Liens encumber Mr. Buesing's real and personal property to the extent of the above-referenced 1987, 1988 and 1989 tax liabilities.*

*In full satisfaction, extinguishment, and release of these Federal Tax Levies and Liens, Mr. Buesing makes the following* ... *offer:*

\* \* \* \* \* \*

*2. $30,000.00 in cash within 90 days of IRS acceptance* ...

(emphasis added).[6] As emphasized above, the March 8, 1995 letter requests a release of

---

6. The plaintiff's first offer, Option One, is omitted because there appears in the facts submitted to

the court to have been no agreement on the terms included in that first offer.

the Federal Tax Levies and Liens on the plaintiff's personal property for the tax years of 1987, 1988 and 1989 for the amount of $30,000.00, subject to a discharge from the United States Bankruptcy Court.

The purported acceptance from Revenue Agent Unger, dated March 28, 1998, states:

The Internal Revenue Service agrees that the value of the real and personal property to which our Notice of Federal Tax Liens attach is $30,000.00. Following Chapter 7 discharge by the court and receipt of $30,000.00, the 1987, 1988, and 1989 income tax liabilities of the debtor will be discharged and the Notice of Federal Tax Liens will be released.

This is a procedure that has several steps involving several people, so the actual release will not appear at the county recorders office for about 4 weeks after the discharge and money are received. Payment should be made directly to this office to minimize delay.

The parties have stipulated, consistent with the correspondence, that Revenue Agent Unger "stated that following plaintiff's discharge from a Chapter 7 proceeding and plaintiff's payment of $30,000.00, plaintiff's remaining tax liabilities for 1987 through 1989 would be abated and the lien released." Although the court does not make a finding as to the existence of an enforceable contract at this time, it appears to the court that the two letters, if properly authorized, could constitute a legitimate offer and acceptance, without material deviation as to terms, thereby constituting a contractual agreement between the plaintiff and the IRS.

The defendant places great meaning on the language in the March 28, 1995 letter, stating that the bankruptcy discharge would be from a Chapter 7 proceeding as opposed to Chapter 11 proceeding. An examination of the plaintiff's March 8, 1995 alleged offer letter indicates no distinction as to the form of the bankruptcy proceeding from which the plaintiff would seek a discharge. Moreover, the parties have stipulated that prior to the mailing of the government's March 28, 1995 letter, "[o]n March 22, 1995, [Revenue Officer] Unger discussed with plaintiff's counsel Unger's proposal that plaintiff obtain a dis-

charge from a Chapter 7 proceeding and then buy out the IRS's lien interest in his property." This indicates that there was a meeting of the minds regarding the substance of the March 8, 1998 letter, and at the oral dialogue during which time the same substantive terms were discussed (and apparently agreed upon), that was then confirmed in the March 28, 1998 letter with language that restated the terms of the offer in every material respect. A plain reading of the letter indicates to the court that there is no substantive difference in the terms contained in the two letters and that the letters can constitute an offer and an acceptance. If Revenue Agent Unger had proper authority, a contract was formed between the parties in the instant action.

If, however, the court were to adopt the defendant's argument that the exchange of letters violates the "mirror image" rule, the defendant's contention that the March 28, 1995 letter was not an acceptance of an offer logically suggests that this letter by Revenue Agent Unger could be considered a counter-offer if, once again, Revenue Agent Unger had the authority to contract on behalf of the United States. It is well established that a counter-offer may be accepted by conduct. *See Union Realty Company, Ltd. v. Moses,* 984 F.2d 715, 722 n. 6 (6th Cir.1993); *see also Ismert & Assoc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 541 (1st Cir.1986) ("an offer may be accepted by overt acts."); *Kurio v. United States,* 429 F.Supp. 42, 64 (S.D.Tex.1970) ("a contract will arise if conduct by the original offeror following receipt of the late acceptance amounts to an acceptance of the counteroffer"). "Such acceptance does no violence to the 'mirror image' rule...." *Union Realty Company, Ltd. v. Moses,* 984 F.2d at 722 n.6 (citing horn-book "mirror image" rule articulated in *Canton Cotton Mills v. Bowman Overall Co.,* 149 Tenn. 18, 257 S.W. 398 (1924)).

In the instant case, the plaintiff's conduct indicates acceptance of a purported counter-offer. First, the plaintiff converted his Chapter 11 proceeding to a Chapter 7 proceeding. Second, plaintiff settled his divorce action using the same equity figure to determine a basis for resolving that proceeding

with Ms. Michael–Buesing. The consent judgment in that action provided that the plaintiff was to pay Ms. Michael–Buesing $5,000.00 on or before March 31, 1995, and $25,000.00 upon the sale of the Clubhouse Drive property, for a total of $30,000.00. Third, on June 14, 1995, the plaintiff filed an emergency motion with the bankruptcy court to abandon the exempt homestead (Clubhouse Drive) property from the Chapter 7 estate, and on the same date, the court entered an order abandoning the Clubhouse Drive property from plaintiff's estate. Fourth, on June 16, 1995, the plaintiff tendered to the IRS a cashier's check in the amount of $30,000.00, in an attempt to substantially perform the purported counter-offer.

■ The defendant also argues that the authority of Revenue Agent Unger was not sufficient to bind the government to the settlement agreement. The law regarding binding authority has been carefully articulated by the United States Court of Appeals for the Federal Circuit:

> The general requirements for a binding contract with the United States are identical for both express and implied contracts. *See, e.g., Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d 474, 482 (1976); *Thermalon Indus. v. United States,* 34 Fed.Cl. 411, 414 (1995). The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration. *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *see also Thermalon,* 34 Fed. Cl. at 414; *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289, 295 (1982). A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States. *City of El Centro,* 922 F.2d at 820. Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government,

and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority. *Id.; Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

*Trauma Service Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997)

■ The facts available to the court, in the parties' papers filed with the court, present uncertainty as to whether Revenue Agent Unger had the authority to bind the government in a contract to release the tax lien that was upon the plaintiff's property. The parties agree that Revenue Agent Unger was delegated in the place of his supervisor Edward Perry as Acting Chief of the Chapter 7/11 Insolvency Section of the Special Procedures Function Collection Branch of the IRS Collection Division in Phoenix, Arizona, on the day that Unger wrote the March 28, 1995 letter. In addition, there appears to be some controversy as to whether Revenue Agent Unger had obtained approval on the proposed settlement agreement from his superior, Mr. Perry. These facts are of material significance to the outcome of this litigation. Therefore, it is prudent for the court to deny the motion to dismiss, pending an appropriate determination of Revenue Agent Unger's authority.[7]

Once the plaintiff in the instant action has alleged properly the existence of the requisite elements for either an express contract or, alternatively, for an implied-in-fact contract, however, the court's role when deciding a motion to dismiss based on a 12(b)(1) motion for lack of jurisdiction is only to determine if the plaintiff has properly alleged a claim that is compensable in this forum. *See Total Medical Management v. United States,* 104 F.3d at 1319 ("the law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven.") (citing *Spruill v. Merit Sys. Protection Board,* 978 F.2d at 686, *Gould, Inc. v. United States,* 67 F.3d at

---

7. As will be discussed more fully below, these same genuine issues of material fact likewise render any summary judgment motion premature at this time. Defendant's arguments regarding unilateral mistake and material misrepresen-

tation also are reserved for disposition pursuant to the motion for summary judgment and are discussed below in that portion of the court's opinion.

929); *see Trauma Serv. Group v. United States,* 104 F.3d at 1325. The court, therefore, must deny the defendant's motion to dismiss based upon the alleged absence of a valid contract.

■ The defendant also contends that the plaintiff's complaint inappropriately requests relief that is not available in this court, in particular, specific performance and declaratory judgment. When assessing an individual taxpayer request for relief, the United States Court of Appeals for the Federal Circuit wrote, in *Brown v. United States,* 105 F.3d 621, 624 (1997), that "[t]he Tucker Act does not provide independent jurisdiction over such claims [declaratory or injunctive relief] for equitable relief." [8] *See also United States v. King,* 395 U.S. 1, 5, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) ("In the absence of an express grant of jurisdiction from Congress, we decline to assume that the Court of Claims has been given the authority to issue declaratory judgments."). This court, therefore, is without jurisdiction to entertain plaintiff's claims for declaratory judgment and injunctive relief. This court holds that those portions of plaintiff's complaint that seek relief either in the form of specific performance or declaratory judgment are without foundation for relief in this court and must be dismissed.

The court, therefore, hereby **DENIES** in part defendant's motion to dismiss on the issue of whether a contract was formed between plaintiff and the IRS and **GRANTS** in part defendant's motion to dismiss on the ground that plaintiff's claims for specific performance and declaratory judgment fall outside this court's jurisdiction.

## II. Motion for Summary Judgment

In the alternative, the defendant also filed a motion for summary judgment, and the plaintiff filed a cross-motion for summary judgment. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States,* 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to

---

8. Congress, however, has authorized that the United States Court of Federal Claims, under 28 U.S.C. § 1507 (1994), "shall have jurisdiction to hear any suit for and issue a declaratory judgment under section 7428 of the Internal Revenue Code of 1986." Section 7428 applies to challenges to Internal Revenue Service determinations as to whether an entity is (i) a tax-exempt charitable organization, (ii) a private foundation, or (iii) a private operating foundation. *See* 26 U.S.C. § 7428 (1994). As Mr. Buesing is litigating as an individual plaintiff, this statutory exception regarding declaratory judgments in tax cases is not applicable. *See United States v. King,* 395 U.S. at 3–5, 89 S.Ct. 1501.

weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States,* 19 Cl.Ct. 326, 328 (1990), *aff'd,* 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the nonmoving party cannot present evidence to support its case under any scenario, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

The defendant states that no genuine issues of material fact are in dispute and that summary judgment is appropriate. The parties also have filed joint stipulations of fact along with underlying documents. Initially, the plaintiff agreed that no genuine issues of material fact are in dispute, however as is discussed more fully below, the plaintiff subsequently argues to the contrary. In addition, as addressed earlier in this opinion, there appear to be a number of issues that render summary judgment inappropriate, specifically disputes surrounding the authority of Revenue Agent Unger and particular facts that arose during the settlement negotiations regarding the disposition of the plaintiff's Clubhouse Drive property.

The government argues that "if the Court finds that a binding agreement was formed between the IRS and plaintiff respecting the release of the lien, as a matter of law it is voidable because of plaintiff's misrepresentation of his intentions with respect to the Clubhouse Drive property." The defendant cites the Restatement (Second) of Contracts § 164(1), addressing material misrepresentation, to support the statement that the contract is voidable as a matter of law. In particular, the government points to the discussions between the plaintiff and Revenue Agent Unger regarding the value of plaintiff's property and his intention to retain, rather than sell, the Clubhouse Drive property. The government also suggests that

plaintiff's lack of notice to Revenue Agent Unger that Mr. Buesing had signed a listing agreement with a real estate agent for the sale of his property in the amount of $339,-900.00 is another example of plaintiff's material misrepresentation. The defendant specifically states:

> Plaintiff's assertion that he would not sell his property was a misrepresentation because it was not in accord with the facts. Restatement (Second) [of Contracts] § 159. Had Unger known plaintiff's true intention, he would not have agreed to accept the $30,000 estimated value of plaintiff's equity in the residence in exchange for releasing the tax lien. Unger would have demanded plaintiff's entire equity established by the sale price—$78,008.38, as it turned out—to which the IRS was entitled, not merely the estimated value.... Unger assented to estimating the value of plaintiff's equity in his home based on plaintiff's representation that he wanted to keep the house.

The defendant's second argument in support of summary judgment likewise states "if the Court finds that the IRS entered into a binding agreement with plaintiff, the stipulated facts state grounds for rescission on the basis of the IRS's unilateral mistake as to the value of plaintiff's equity in the Clubhouse Drive property to which the tax lien attached." The government again cites the Restatement (Second) of Contracts for the proposition that a contract premised upon a unilateral mistake may be rescinded. The defendant states:

> Unger's unilateral mistake was using an estimated value of plaintiff's equity in the Clubhouse Drive residence, rather than his equity as established by the sale of the house, to compute the IRS's lien interest in plaintiff's property. Unger calculated plaintiff's equity and thereby the IRS's lien interest based on plaintiff's declaration that he intended to keep his residence; plaintiff's stated intention not to sell the house was a basic assumption on which the purported agreement was reached. The mistake had a material effect on the purportedly agreed exchange of performances, because the IRS committed to releasing its

lien for $48,000 less than the value of plaintiff's equity in the real property, to which it was entitled under § 6322, and in contravention of § 6325(a) (lien released only upon satisfaction of liability or determination that it is unenforceable). The risk of the mistake was not allocated to the IRS under the purported agreement, nor would it be reasonable to allocate the risk to the IRS under the circumstances. Plaintiff had reason to know of the IRS's mistake, because he made a representation to the IRS about his intentions which was contrary to fact. Accordingly, in the event the Court determines that a contract was formed between plaintiff and the IRS, the contract is subject to rescission on grounds of the IRS's unilateral mistake.

(citations and footnotes omitted).

In response, the plaintiff argues in his filings with the court that if the court deems these issues material, there exist genuine issues of material fact in dispute between the parties that render summary judgment inappropriate. The plaintiff argues that the defendant misapplied the facts or misinterpreted the facts so as to demonstrate a genuine issue of material fact. The plaintiff specifically states:

> The IRS distorts the Joint Stipulation of the parties. The IRS tries to stretch the statements contained in Paragraph 24 of the Joint Stipulation to an unequivocal guarantee by Plaintiff that Plaintiff would keep, and would not sell, his home. Plaintiff did not mislead the IRS about his intention to keep his house. Plaintiff does not deny that he wanted to keep his home, but what Plaintiff wanted and could do at the time he was negotiating the agreement was, to a large extent, out of his control. Plaintiff said as much to the IRS, and the IRS was aware of his personal and financial problems. In light of his financial problems and difficulties in his dissolution of marriage proceeding, Plaintiff was in no position to promise that he would keep his home. Any such promise would have been empty and unreliable on its face.

Plaintiff submits that he has a binding and enforceable agreement with the IRS, regardless of (1) his intentions regarding

keeping or selling his home and (2) Unger's feelings about what Plaintiff should, or was going to, do about his home. The agreement does not require Plaintiff to keep his home and does not prohibit Plaintiff from selling it to pay the IRS the agreed upon value of the liens of $30,000.00 (Query whether the IRS would have accepted, for example, $10,000.00 in full satisfaction of the tax liens if the sale price was only $280,000.00 (i.e., $20,000.00 less than the agreed upon amount of $300,-000.00).) On behalf of the IRS, Unger specifically discussed with Plaintiff's counsel that the agreement must include that Plaintiff obtain his discharge. Presumably, if such an understanding existed or was important to Unger, Unger would have also insisted that Plaintiff commit in the agreement to refrain from selling his home. This did not happen.

(citations omitted). The plaintiff also points out that if this condition, that plaintiff would keep his home rather than sell it, was essential to the agreement, the IRS would have expressly so stated.

The plaintiff's last argument is that the government is "equitably estopped from ... denying the existence of a valid and binding agreement with Plaintiff to buy out the IRS's liens" because Buesing relied to his detriment on an agreement with an apparently authorized IRS agent:

> Plaintiff and his attorney engaged in negotiations with Mr. Unger of the IRS for over one year: first, regarding the nondischargeability of the underlying tax indebtedness and, second, regarding the value and buy out of the lien. At all times, Mr. Unger maintained that he had authority, or obtained authority from a superior, to resolve the above issues on behalf of, and to bind, the IRS. Plaintiff relied to his detriment upon Mr. Unger's representations, as authorized agent for the IRS: he converted his Chapter 11 case to one under Chapter 7 and he settled the Divorce Action in a like manner (i.e., he paid his former wife an equivalent $30,000.00). Of course, there is no way to rectify the harm caused by Plaintiff's reliance upon the representations and actions of Unger on behalf of the IRS. Accordingly, the IRS is equitably estopped from denying the existence of a valid and enforceable contract with Plaintiff.

The United States Court of Appeals for the Federal Circuit has quoted approvingly the Restatement (Second) of Contracts § 162 (1979) defining material misrepresentation. *See T. Brown Constructors, Inc. v. Pena*, 132 F.3d 724, 729 (Fed.Cir.1998) ("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."). The Restatement (Second) of Contracts § 164(1) provides that a contract is voidable when (1) a party made a misrepresentation, (2) the misrepresentation was material, (3) the misrepresentation induced the other party to enter into the contract, and (4) the other party was justified in relying on the misrepresentation. *See Morris v. United States*, 33 Fed.Cl. 733, 745 (1995) (adopting the Restatement (Second) of Contracts test for misrepresentation); *National Rural Util. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. 130, 142 (1988) (adopting the Restatement (Second) of Contracts test for misrepresentation), *aff'd*, 867 F.2d 1393 (Fed.Cir.1989); *Lehner v. United States*, 1 Cl.Ct. 408, 415 (1983) (adopting the Restatement (Second) of Contracts test for misrepresentation). The United States Court of Appeals for the Federal Circuit has applied the same concept of material misrepresentation against both the government and a plaintiff in this court. *See, e.g., Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 667 (Fed.Cir.1992); *Summit Timber Co. v. United States*, 230 Ct.Cl. 434, 441, 677 F.2d 852, 857 (1982); *Morrison–Knudsen Co. v. United States*, 170 Ct.Cl. 712, 719, 345 F.2d 535, 539 (1965); *Morris v. United States*, 33 Fed.Cl. 733, 744–47 (1995).

The law of unilateral mistake is defined in the Restatement (Second) of Contracts § 151 (1981), and states "[a] mistake is a belief that is not in accord with the facts." *See National Rural Utilities Cooperative Finance Corp. v. United States*, 14 Cl.Ct. at 141. The elements of a claim for unilateral mistake are as follows:

## § 153. When Mistake of One Party Makes a Contract Voidable

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154,[9] and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153 (1981). The term "reason to know" is discussed in the Restatement (Second) of Contracts in section 19, comment b:

A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

Reason to know is to be distinguished from knowledge and from "should know." Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious. "Should know" imports a duty to others to ascertain facts; the words "reason to know" are used both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know.

Restatement (Second) of Contracts § 19 cmt. b (1981) (footnotes omitted).

■ The doctrine of equitable estoppel is a judicial remedy by which a party may be precluded by his own act or omission, from asserting a right to which he otherwise would have been entitled. *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Although the United States Supreme Court in *Heckler* did not come to a final conclusion as to whether estoppel could be raised against the United States, the Supreme Court seems to suggest that there are limited cases in which such a finding might not be precluded. *Id.* at 60, 104 S.Ct. 2218. The United States Supreme Court stated in *Heckler:*

When the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant. Petitioner urges us to expand this principle into a flat rule that estoppel may not in any circumstances run against the Government. We have left the issue open in the past, and do so again today. Though the arguments the Government advances for the rule are substantial, we are hesitant, when it is unnecessary to decide this case, to say that there are no cases in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government. But however heavy the burden might be when an estop-

9. The Restatement (Second) of Contracts addresses "When a Party Bears the Risk of a Mistake" in section 154:

A party bears the risk of a mistake when
(a) the risk is allocated to him by agreement of the parties, or
(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or
(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.
Restatement (Second) of Contracts § 154 (1981).

pel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present.

*Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. at 60–61, 104 S.Ct. 2218 (footnotes omitted). When a claimant raises equitable estoppel against the government, in order to prevail and warrant judicial intervention, however, the defendant bears a heavy burden of proving the elements of estoppel. *See id.* at 61, 104 S.Ct. 2218.

■ In *Tonkonogy v. United States,* 417 F.Supp. 78, 79 (S.D.N.Y.1976), a United States District Court articulated guidance for applying the estoppel test against the government. This court believes the standards articulated in *Tonkonogy v. United States* are common-sense guidelines, appropriate for adoption in this court, and should be applied to test plaintiff's estoppel claims in the instant case. This test has also been utilized by other judges of the United States Court of Federal Claims in the context of tax cases. *See Last v. United States,* 37 Fed.Cl. 1, 10 (1996); *Rocovich v. United States,* 18 Cl.Ct. 418, 424 (1989), *aff'd,* 933 F.2d 991 (1991). In order to prevail on an estoppel theory the following elements must be proven:

(1) a misrepresentation by an agent of the United States acting within the apparent scope of his duties;

(2) the absence of contrary knowledge by the taxpayer in circumstances where he may reasonably act in reliance;

(3) actual reliance;

(4) detriment; and

(5) a factual context in which the absence of equitable relief would be unconscionable.

*Tonkonogy v. United States,* 417 F.Supp. at 79.

This court also is mindful of prior decisions by the United States Court of Appeals for the Federal Circuit that have warned against prematurely deciding which party bears the risk of a mistake and in concluding that a party's intentions are irrelevant to a determination of a mistake. *See Burnside–Ott Aviation Training Center, Inc. v. United States,* 985 F.2d 1574, 1581 (Fed.Cir.1993). In addition, this court is aware that its function in examining a summary judgment motion is not to weigh the evidence but rather to determine whether a genuine issue for trial exists. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505. Likewise, the United States Supreme Court has emphasized that when there is sufficient evidence to raise a question as to the outcome of a case, summary judgment should be denied. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d at 163; *H.F. Allen Orchards v. United States,* 749 F.2d at 1574.

■ The defendant seeks summary judgment premised on an argument that there was unilateral mistake or material misrepresentation as to the equity value of plaintiff's Clubhouse Drive property. The plaintiff's cross-motion for summary judgment argues that the government is bound to the contract regardless of any mistake or misrepresentation under the doctrine of equitable estoppel. However, the parties' motions for summary judgment are premature at this stage of the proceedings. A number of issues of fact have been raised by the parties in papers presented to the court that weigh against resolution of the instant case upon summary judgment pleadings. It appears that there are questions of fact surrounding the impact upon Revenue Agent Unger's understanding of the equity value of the property owned by the plaintiff, Unger's interpretation of plaintiff's intent to retain or sell the house, and how these issues impacted Unger's determinations for settlement negotiation purposes. In addition, there is an issue as to the plaintiff's intent, or stated intent, to reside in or sell the Clubhouse Drive property.

The issues of materiality, mistake and "reason to know" need further examination by a trier of fact. Moreover, insufficient information is available to the court at this time to resolve the issues raised regarding the authority of Revenue Agent Unger to enter into a settlement agreement and the doctrine of equitable estoppel raised by the plaintiff. Therefore, the court, hereby, **DE-**

NIES the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment on the grounds that there remain in dispute outstanding issues of material fact.

## CONCLUSION

The court, hereby, **DENIES** in part defendant's motion to dismiss on the issue of whether a contract was formed between plaintiff and the IRS and **GRANTS** in part defendant's motion to dismiss on the ground that plaintiff's claims for specific performance and declaratory judgment fall outside this court's jurisdiction. In addition, the court **DENIES** the defendant's motion for summary judgment and the plaintiff's cross-motion for summary judgment.

**IT IS SO ORDERED.**